# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 20-947V**
**Filed: October 5, 2026**

| | |
|---|---|
| JESSICA MOTT, *on behalf of L.C., a minor*,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Special Master Horner |

*Michael Andrew London, Douglas & London, P.C., New York, NY, for petitioner.*
*Felicia Langel, U.S. Department of Justice, Washington, DC, for respondent.*

## RULING ON ENTITLEMENT[1]

On July 31, 2020, petitioner filed a petition on behalf of her daughter, L.C., under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10, *et seq.* (2012).[2] (ECF No. 1.) Petitioner alleges that L.C. suffered intussusception resulting in death caused-in-fact by the third dose of the rotavirus (RotaTeq) vaccine administered on July 17, 2018. (ECF No. 29.) For the reasons set forth below, I conclude that petitioner is entitled to an award of compensation.

### I. Applicable Statutory Scheme

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines. In

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] All references to "§ 300aa" below refer to the relevant section of the Vaccine Act at 42 U.S.C. § 300aa-10-34.

general, to gain an award, a petitioner must make a number of factual demonstrations, including showing that an individual received a vaccination covered by the statute; received it in the United States; suffered a serious, long-standing injury; and has received no previous award or settlement on account of the injury. Finally – and the key question in most cases under the Program – the petitioner must also establish a *causal link* between the vaccination and the injury. In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury." That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table. If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination. § 300aa-11(c)(1)(C)(i); § 300aa-13(a)(1); § 300aa-14(a).

In many cases, however, the vaccine recipient may have suffered an injury *not* of the type covered in the Vaccine Injury Table. In such instances, an alternative means exists to demonstrate entitlement to a Program award. That is, the petitioner may gain an award by showing that the recipient's injury was "caused-in-fact" by the vaccination in question. § 300aa-13(a)(1)(B); § 300aa-11(c)(1)(C)(ii). In such a situation, of course, the presumptions available under the Vaccine Injury Table are inoperative. The burden is on the petitioner to introduce evidence demonstrating that the vaccination actually caused the injury in question. *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005); *Hines ex rel. Sevier v. Sec'y of Health & Human Servs.*, 940 F.2d 1518, 1525 (Fed. Cir. 1991).

Intussusception is a Table Injury for the rotavirus vaccine. 42 C.F.R. 100.3(a)(XI). In this case, however, because petitioner alleges that L.C.'s intussusception followed a third dose of the rotavirus vaccine, the injury does not qualify as a Table Injury.[3] 42 C.F.R. 100.3(c)(4)(ii)(A). Therefore, petitioner must meet the burden of proof for establishing causation-in-fact.

The showing of "causation-in-fact" must satisfy the "preponderance of the evidence" standard, the same standard ordinarily used in tort litigation. § 300aa-13(a)(1)(A); *see also Althen*, 418 F.3d at 1279; *Hines*, 940 F.2d at 1525. Under that standard, the petitioner must show that it is "more probable than not" that the vaccination was the cause of the injury. *Althen*, 418 F.3d at 1279. The petitioner need not show that the vaccination was the sole cause but must demonstrate that the vaccination was at least a "substantial factor" in causing the condition, and was a "but for" cause. *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352 (Fed. Cir. 1999). Thus, the petitioner must supply "proof of a logical sequence of cause and effect showing that the vaccination was the reason for the injury," with the logical sequence

[3] Petitioner initially alleged that after receiving a rotavirus vaccination on July 17, 2018, L.C. subsequently suffered a Table Injury of intussusception resulting in death under category XI of the Vaccine Injury Table. (ECF No. 1, p. 1.) However, petitioner filed an amended petition on April 28, 2022, alleging that L.C. suffered an "Off-Table" Injury of intussusception resulting in death. (ECF No. 29.)

being supported by "'reputable medical or scientific explanation[,]' *i.e.*, 'evidence in the form of scientific studies or expert medical testimony.'" *Althen*, 418 F.3d at 1278 (alteration in original) (quoting *Grant v. Sec'y of Health & Human Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992)). A petitioner may not receive a Vaccine Program award based solely on his or her assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. § 300aa-13(a)(1).

In what has become the predominant framing of this burden of proof, the *Althen* court described the "causation-in-fact" standard, as follows:

> Concisely stated, [petitioner]'s burden is to show by preponderant evidence that the vaccination brought about her injury by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury. If [petitioner] satisfies this burden, she is "entitled to recover unless the [government] shows, also by a preponderance of the evidence, that the injury was in fact caused by factors unrelated to the vaccine."

*Althen*, 418 F.3d at 1278 (third alteration in original) (citations omitted). The *Althen* court noted that a petitioner need not necessarily supply evidence from medical literature supporting petitioner's causation contention, so long as the petitioner supplies the medical opinion of an expert. *Id*. at 1279-80. The court also indicated that, in finding causation, a Program fact-finder may rely upon "circumstantial evidence," which the court found to be consistent with the "system created by Congress, in which close calls regarding causation are resolved in favor of injured claimants." *Id*. at 1280.

## II. Procedural History

Petitioner initially filed L.C.'s death certificate, an affidavit, limited letters of administration, and medical records. (ECF Nos. 6-7, 14, 16; Exs. 1-10.) Based on the allegations in the petition, the case was initially assigned to the Chief Special Master as part of the Special Process Unit ("SPU"). (ECF Nos. 18-19.) Petitioner then filed additional medical records in January and March of 2022. (ECF Nos. 24, 27; Exs. 11-14.) In July of 2022, petitioner filed the autopsy report and a statement of completion. (ECF Nos. 33-34; Ex. 15.)

Respondent filed his Rule 4(c) Report, recommending against compensation, on September 30, 2022. (ECF No. 36.) Respondent contended that the medical records are inadequate to support petitioner's burden of proof and also raised the issue of a documented viral infection as a more likely cause of L.C.'s intussusception. (*Id.* at 6.) The case was reassigned to the undersigned in November of 2022. (ECF Nos. 38-39.)

Thereafter, in April of 2023, petitioner filed an expert report by pediatrician Margie Andreae, M.D., along with accompanying medical literature. (ECF Nos. 42, 44;

Exs. 16-30.) On July 21, 2023, respondent filed an expert report by pediatric gastroenterologist Chris A. Liacouras, M.D., along with accompanying medical literature. (ECF No. 46; Ex. A.)

In a scheduling order issued on July 26, 2023, the undersigned noted that the RotaTeq package insert, filed as Court Exhibit I, indicates that a history of intussusception is a contraindication[4] for administration of a RotaTeq vaccine. (ECF No. 47.) Because Drs. Andreae and Liacouras both discussed epidemiology in their initial reports, the undersigned directed the parties to file reports by their respective experts addressing whether the contraindication has any bearing on the epidemiologic evidence regarding the second and third doses of the rotavirus vaccine. (*Id.*) On November 18, 2023, petitioner filed a supplemental report by Dr. Andreae responding to Dr. Liacouras. (ECF No. 50; Exs. 31-33.) Thereafter, on April 3, 2024, petitioner filed a second supplemental report by Dr. Andreae responding to the undersigned's July 26, 2023 order. (ECF No. 55; Exs. 34-36.) On August 2, 2024, respondent filed a supplemental report by Dr. Liacouras (ECF No. 57; Ex. B), as well as an additional report by epidemiologist Heather McKay, Ph.D. (ECF No. 58; Ex. C).

On August 15, 2024, the undersigned issued a Rule 5 order providing preliminary guidance to the parties. (ECF No. 59.) In pertinent part, the undersigned noted that while the epidemiologic evidence is entitled to some weight, it is not likely to be dispositive. (*Id.* at 2-3.) Thereafter, respondent filed a supplemental report by Dr. Liacouras (ECF No. 64; Ex. D), and petitioner filed a supplemental report by Dr. Andreae (ECF Nos. 66-67; Exs. 37-46). An entitlement hearing commenced on December 9, 2025, at the Office of Special Masters in Washington, D.C. (Transcript of Proceeding ("Tr."), at ECF Nos. 84-85.) Dr. Andreae testified on behalf of petitioner, and Drs. Liacouras and McKay testified on behalf of respondent. (*Id.*)

Accordingly, this case is now ripe for resolution of petitioner's entitlement to compensation.

## III. Factual History

L.C. was born at Woodhull Medical and Mental Health Center ("Woodhull Medical Center") on December 3, 2017, at full-term and without any complications. (Ex. 5, pp. 5, 12; Ex. 8, pp. 7-9.) L.C.'s newborn exam was normal, and she was discharged on December 5, 2017, after an uneventful hospital stay. (Ex. 5, pp. 4-6, 10-14, 31-34; Ex. 8, pp. 8-9, 16-17.) Thereafter, L.C. had routine well baby visits and received routine vaccinations.[5] (Ex. 5, pp. 49-58, 69-87.) L.C. received her first dose of the rotavirus

---

[4] A contraindication is "any condition, especially any condition of disease, which renders some particular line of treatment improper or undesirable." *Contraindication*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=10980 (last visited Oct. 1, 2026).

[5] While petitioner declined the administration of hepatitis B vaccine for L.C. after her birth (Ex. 5, p. 5), L.C. received her first hepatitis B vaccination at her ten-day well baby visit on December 13, 2017 (*Id.* at 55).

vaccine, RotaTeq, on February 8, 2018, and her second dose on May 17, 2018. (*Id.* at 73, 86.) While she had visits for a cough and an upper respiratory infection, she was otherwise healthy and her pre-vaccination medical history was unremarkable.[6] (Ex. 5, pp. 61-66 (emergency department visit for cough), 78-80 (L.C. diagnosed with upper respiratory infection at 5-month well baby visit).)

On July 17, 2018, L.C. presented for her 7-month well baby visit. (Ex. 5, pp. 88-93.) Petitioner complained that L.C. was suffering from a cold, and L.C. was diagnosed with an acute upper respiratory infection. (*Id.* at 88, 90.) L.C.'s physical examination was normal, and the pediatrician documented that L.C. was otherwise healthy. (Ex. 5, pp. 88-90.) At this encounter, L.C. received her third dose of RotaTeq, Pediarix,[7] and pneumococcal conjugate vaccines. (*Id.* at 91-92)

At approximately 9:00 PM on July 28, 2018, L.C. was transported to JFK Medical Center emergency department via ambulance after suffering a 30 minute seizure. (Ex. 13, pp. 11-12.) L.C.'s grandmother reported that she called emergency medical services ("EMS") after finding L.C. unresponsive. (*Id.* at 12.) Upon arrival of EMS, L.C. was treated with Ativan and stopped seizing two minutes later. (*Id.*) L.C.'s family reported that she had been sick with cold symptoms, including nasal congestion and cough, since Tuesday, July 24, 2018. (*Id.*) They also reported that L.C. had been experiencing diarrhea and vomiting for the past two days with a one-day history of bloody stools. (*Id.*) L.C.'s grandmother, who had been caring for L.C. for the past three days, noted that L.C.'s maximum temperature was 99 degrees Fahrenheit and also reported giving L.C. water earlier in the day. (*Id.*)

When L.C. arrived at the emergency department, it was noted that she was afebrile and "post ictal." (Ex. 13, p. 12.) On physical exam, L.C. was noted to be unresponsive; however, the emergency room physician later documented "[b]aby alert, with hiccough, looking around." (*Id.* at 13.) The nursing assessment indicated that L.C. was responsive to painful stimuli and noted to be grunting, agitated, and restless. (*Id.* at 19.) L.C.'s abdomen was non-tender and distended with hypoactive bowel sounds. (*Id.* at 13, 19.) The emergency room physician documented that L.C.'s respiratory effort was easy and unlabored on exam, with no signs of respiratory distress. (*Id.* at 13.) However, the respiratory assessment conducted by the nurse was positive for upper airway congestion and revealed respiratory effort, signs of distress, shallow respirations, nasal flaring, and wheezing. (*Id.* at 19.) L.C. was positive for thick secretions with deep suctioning and underwent placement of a nasogastric tube. (*Id.* at 20.) Clear, green fluid, which was not suspected to be bile, was observed with suctioning. (*Id.* at 13, 20.) L.C.'s grandparents denied giving L.C. anything green. (*Id.* at 13.) L.C. was also found to be mildly tachypneic and started on one liter of oxygen. (Ex. 13, pp. 13-14, 17-18, 30.)

---

[6] L.C. did have slightly elevated bilirubin levels four days after birth (Ex. 5, pp. 49-50); however, by the time of her ten-day well baby visit, L.C.'s physical exam was negative for jaundice (*Id.* at 53). Later medical records note that L.C. did not require phototherapy to resolve her jaundice. (Ex. 13, p. 34.)

[7] Pediarix is a combination vaccine that includes DTaP, hepatitis B, and polio vaccinations in a single shot. (Ex. 5, p. 91.)

Laboratory testing showed low sodium at 125 mEq/L (reference range of 133-145 mEq/L) and chloride at 87 mEq/L (reference range of 95-108 mEq/L); elevated glucose at 138 mg/dL (reference range of 74-106 mg/dL), C reactive protein at 1.27 mg/dL (reference range of 0.0-0.5 mg/dL), and ANION gap at 23 mEq/L (reference range of 10-20 mEq/L); and a positive stool guaiac test. (*Id.* at 13, 23, 34-35.) Based on L.C.'s low sodium levels, her seizure was initially believed to be due to hyponatremia and she was started on IV fluids. (*Id.* at 13-14, 17-20, 30.) Based on the positive stool guaiac test, an abdominal ultrasound was ordered and was ultimately unremarkable, showing no signs of intussusception. (*Id.* at 23-24, 34-35, 86.) Additionally, L.C. underwent a chest x-ray, which was unrevealing, as well as an abdominal x-ray limited to assessment for free air, which revealed "[d]istended colonic and probable mid abdomen small bowel loops" with a "[m]oderate to large amount of stool in the colon." (*Id.* at 22-23, 84-85.) L.C.'s PCR panel was positive for metapneumovirus, but negative for other respiratory viruses, including adenovirus, influenza, and coronavirus. (*Id.* at 24-25, 86.) After reviewing L.C.'s labs and other testing, the intensivist, Dr. Jonna, recommended that she be admitted to the pediatric special care unit, continued on IV fluids, and undergo repeat laboratory testing for potassium and sodium. (*Id.* at 13.) Dr. Jonna further opined that it was not likely that L.C.'s seizure was due to hyponatremia as her seizure resolved with Ativan. (*Id.*) The emergency room physician documented "Seizure – Electrolyte disturbance / Intussusception / Sepsis / Viral," and L.C.'s condition was listed as critical. (*Id.*)

At approximately 3:00 AM on July 29, 2018, L.C. was admitted to the pediatric intensive care unit ("PICU"). (Ex. 13, pp. 8, 19, 34, 118.) The admitting provider recorded the following history:

> This is a 7-month-old female with 2 weeks' history of persistent cough and congestion. As per mom, was seen by [primary medical doctor] last week where she was evaluated and thought to have a viral illness. . . . [F]or the past 4 days, the patient has been noted to have vomiting and diarrhea. Vomiting was few times a day and diarrhea started 3 days ago with 2-3 times a day as well. The patient was only taking Pedialyte and water, refusing to take any solid food. As per mom, on 07/17, the patient did have immunization at the [primary medical doctor's] office, but otherwise was well appearing, no fever reported in this history. . . . Mom, besides the recent cough and congestion, denies any other known sick contacts. There is no fever. There are no rashes noted. Mom states the patient has been fussy with the vomiting and diarrhea, but is consolable. She denied seeing any blood in the vomitus. Small amount of blood noted in the stool at home. . . . In terms of initial workup, stool guaiac was noted to be positive, therefore abdominal ultrasound was done, which was reported to be negative for intussusception or any other abdominal pathology. The patient was thought to have viral illness and hyponatremia possibly leading to seizure activity, therefore, the patient was admitted to ICU.

(*Id.* at 34.) Physical examination of L.C. revealed coarse upper airway sounds with mild rhonchi but no respiratory distress, tachypnea, or wheezing. (*Id.* at 35.) Her abdomen was noted to be "slightly tense but not distended at this time" with hypoactive bowel sounds. (*Id.*) L.C. was sleepy but arousable during the exam. (*Id.*) Repeat laboratory testing showed low sodium at 126 mEq/L (reference range of 133-145 mEq/L) and chloride at 90 mEq/L (reference range of 95-108 mEq/L), as well as elevated glucose at 121 mg/dL (reference range of 74-106 mg/dL), lactic acid at 2.6 mmol/l (reference range of 0.5-2.0 mmol/l), ANION gap at 23 mEq/L (reference range of 10-20 mEq/L), and neutrophils at 10.71 10e3/uL (reference range of 2.00-7.75 10e3/uL). (*Id.* at 25-26, 35.) L.C.'s potassium levels were measured on repeat at 7.1 mEq/L and then on further repeat at 4 mEq/L (reference range of 3.7-5.6 mEq/L). (*Id.*) The admitting physician documented that the etiology of L.C.'s seizure remained unknown and that her bloody stools could be secondary to infectious colitis in light of her history of diarrhea. (*Id.* at 35-36.) Intussusception remained in the differential but was noted to be less likely, given L.C.'s normal abdominal ultrasound. (*Id.* at 36.) The physician noted that a surgical evaluation or repeat abdominal ultrasound would be necessary if L.C. experienced bloody stool during her admission. (*Id.*)

While in the PICU, treating providers continued to observe clear, green liquid discharged from L.C.'s nasogastric tube. (Ex. 13, p. 118.) Additionally, L.C. had bloody stools with clots and was crying intermittently. (*Id.* at pp. 8, 118, 126.) A stat, repeat abdominal ultrasound was ordered at around 7:15 AM on July 29, 2018. (*Id.* at 72, 118.) The ultrasound revealed "thickened intussuscepting bowel loop seen within the midline of the abdomen just inferior to the umbilicus" with abdominal wall edema and no evidence of abscess or fluid collection. (*Id.* at 87-89.) Due to the nonavailability of a pediatric surgeon, L.C. was transferred via ambulance to Hackensack Medical Center for further treatment of her intussusception at approximately 10:45 AM on July 29, 2018. (*Id.* at 8, 126.)

Upon transfer to Hackensack University Medical Center, L.C. was admitted to the PICU with concern for intussusception. (Ex. 12, pp. 16-18.) L.C. was examined by Rachel Lewis, M.D., a pediatric critical care attending, who documented the following history:

> [L.C.] is a 7 month old female with no past medical history who was brought in to JFK Medical Center by ambulance on 7/28 due to seizure. As per her mother and grandmother, she was in her usual state of health until Tuesday 7/24 of this previous week, when she began to have diarrhea and fever. The entire family also had diarrhea. The fever was resolved by Thursday, but the diarrhea persisted. On Friday she was closer to normal, taking PO well. The following day, yesterday, she was less interested in eating and continued to have diarrhea and decreased [urine output]. She was more tired and floppier, as per grandmother, who was caring for her. By report, she was given water by mouth for hydration. Last night, she had a seizure witness by her grandmother, and an ambulance was called. She received Ativan in the ambulance and was admitted to the PICU.

(*Id.* at 16.) Dr. Lewis also noted that L.C. was positive for human metapneumovirus and admitted status post hyponatremic seizure. (*Id.* at 18.) On exam, L.C. had a temperature of 102.8 degrees Fahrenheit, was sleepy with decreased and delayed response to painful interventions, and was tachypneic with coarse breath sounds. (*Id.* at 17.) L.C.'s abdomen was distended but otherwise soft and non-tender with bowel sounds present. (*Id.*) She was also tachycardic, but Dr. Lewis documented there was "no concern for septic shock." (*Id.* at 17-18.)

From there, L.C. underwent a pediatric surgery consultation. (Ex. 12, pp. 14-16.) Given L.C.'s respiratory viral illness, the plan was to attempt a therapeutic barium enema for possible reduction of L.C.'s intussusception. (*Id.* at 14, 16.) The enema was unsuccessful, failing to move L.C.'s intussusception even a few centimeters. (*Id.* at 19, 28, 213.) Due to the failure of the enema, L.C. underwent an exploratory laparotomy for reduction of intussusception, which was performed by pediatric surgeon David Friedman, M.D. (*Id.* at 28-29.) In his operative note, Dr. Friedman documented that reduction of L.C.'s ileum revealed an area of gangrenous tissue in the ileum. (*Id.* at 28.) Further reduction was performed which allowed for the excision of approximately 15 centimeters of necrotic terminal tissue in the ileum and cecum. (*Id.* at 28, 42.) Following the closure of abdomen, L.C. became hypotensive and difficult to ventilate. (*Id.* at 29.) L.C.'s abdomen was reopened for re-exploration, which showed distended dusky bowel loops. (*Id.* at 20, 29.) L.C. experienced cardiac arrest for approximately five minutes, requiring chest compressions. (*Id.*) L.C.'s intestines were exteriorized with insertion of a sterile IV bag. (*Id.*) Upon the completion of the procedure, L.C. was transported back to the pediatric ICU in critical condition. (*Id.* at 29.) In the pediatric ICU, L.C. experienced an episode of transient bradycardia requiring chest compressions and epinephrine. (*Id.* at 20, 35.) Dr. Friedman recorded that his final impression was that L.C. was in septic shock. (*Id.* at 29.)

The next day, July 30, 2018, L.C.'s condition remained critical. (Ex. 12, pp. 37-39.) When examined that morning, L.C. was unresponsive and sedated on fentanyl. (*Id.* at 38.) Her extremities were cool to touch with sluggish capillary refill. (*Id.*) L.C. remained intubated on a ventilator with evidence of respiratory acidosis. (*Id.*) Nursing staff documented decreased urine output, and difficulty obtaining a pulse in L.C.'s extremities. (*Id.* at 40.) L.C. underwent an echocardiogram, which revealed severely diminished left ventricular systolic shortening, moderately diminished right ventricular systolic shortening, and mildly elevated right ventricular pressure. (*Id.* at 226-28.) The ejection fraction in her left ventricle was estimated to be 25-30%. (*Id.* at 20, 228.) A chest x-ray revealed diffuse bilateral dense opacities consistent with pulmonary edema. (*Id.* at 20, 217-18.) Neurology was consulted to evaluate L.C.'s neurological status following her cardiac arrest. (*Id.* at 12-14.) Physical examination revealed no responsiveness to tactile or auditory stimuli, no corneal reflex, unresponsive pupils, no spontaneous or reactive movements, and flaccid tone in all extremities. (*Id.* at 13.) An EEG found diffuse background attenuation indicative of severe diffuse cerebral dysfunction. (*Id.* at 20, 31-32.)

L.C.'s condition continued to deteriorate. (Ex. 12, pp. 20, 41-43.) Her perfusion was poor and did not improve with increasing inotropic support or fluid challenge. (*Id.* at 20, 41.) Arterial blood gas results demonstrated respiratory failure. (*Id.* at 20.) L.C.'s lab work indicated worsening renal, hepatic, respiratory, and cardiac failure with cardiac ischemia, disseminated intravascular coagulation, and metabolic acidosis. (*Id.*) Treating providers opined that L.C.'s prognosis was grave, counseling her family that L.C. was dying and that the machines were just prolonging her death. (*Id.* at 20, 41, 63.) Given L.C.'s condition and poor prognosis, her family elected to not escalate her care and to make no attempt at resuscitation in the event of another cardiac arrest. (*Id.* at 20, 43, 51-52.) On July 31, 2018, L.C.'s parents decided to withdraw care, and she was terminally extubated. (Ex. 12, pp. 20, 63.) L.C. was pronounced deceased at 12:28 PM. (*Id.* at 63.) Her death certificate lists septic shock due to intussusception as L.C.'s cause of death. (Ex. 3, p. 2.)

The surgical pathology report noted histopathologic findings of ischemic ileocolitis with mucosal necrosis and acute inflammation consistent with a clinical history of intussusception, lymphoid hyperplasia and ischemic necrosis of the ileum, and no evidence of malignancy. (Ex. 12, p. 142.) Immunohistochemical and histochemical stains were performed, which were negative for adenovirus, cytomegalovirus, and fungal organisms. (*Id.*)

L.C.'s family requested an autopsy (Ex. 12, pp. 20, 63; Ex. 15, p. 4), which was performed by Debra S. Heller, M.D. (Ex. 15). Dr. Heller documented L.C. "had surgery and resection of necrotic small bowel secondary to intussusception, possibly related to lymphoid hyperplasia due to a viral infection." (*Id.* at 5.) L.C.'s autopsy revealed "significant necrosis of exteriorized small bowel, approximately 56 cm in length. Liver and lung findings support the diagnosis of shock." (*Id.*) Additionally, a segment of the ileum showed "ischemic necrosis, with extensive mucosal necrosis," and the ileum showed lymphoid hyperplasia. (*Id.* at 4.)

In a joint prehearing submission, the parties stipulated to L.C.'s diagnosis of intussusception and to the fact that, prior to receiving the Rotavirus vaccine, L.C. had neither been diagnosed with intussusception nor presented to any medical provider for symptoms associated with intussusception. (ECF No. 74, p. 1.)

## IV. Summary of Expert Opinions

### a. Petitioner's Expert Pediatrician, Margie Andreae, M.D.[8]

[8] Dr. Andreae received her medical degree from the University of Michigan Medical School in 1991. (Ex. 17, p. 1; Ex. 47, p. 1.) She completed her pediatric internship and residency at William Beaumont Hospital in Royal Oak, Michigan, in 1992 and 1995, respectively. (Ex. 17, p. 1; Ex. 47, p. 1.) Dr. Andreae maintains her license to practice medicine in Michigan and is board-certified in pediatrics. (Ex. 17, p. 1; Ex. 47, p. 1.) Since completing her pediatric residency in 1995, Dr. Andreae has held various academic appointments and clinical positions at the University of Michigan, Ann Arbor health system. (Ex. 16, p. 2; Ex. 17, pp. 1-2; Ex. 47, pp. 1-2.) Currently, Dr. Andreae serves as a Clinical Professor Emerita in the Department of Pediatrics at the University of Michigan. (Ex. 47, p. 2.) She has co-authored approximately 26 peer-reviewed publications, 5 peer-reviewed clinical practice guidelines, and 8

Dr. Andreae provided four expert reports and testified on petitioner's behalf at the entitlement hearing. (Exs. 16, 31, 34, 37; Tr. 5-222.)

Dr. Andreae explains that intussusception is a bowel obstruction that occurs when one segment of the intestine telescopes, or folds into, an adjacent segment of the intestine, usually as a result of some abnormality in the intestinal wall, known as a "lead point," that results in a leading or tugging force during bowel peristalsis. (Ex. 16, p. 6; Tr. 30, 130.) The condition is most prevalent in pediatric patients between two months and one year of age, and most commonly occurs at the point where the ileum joins the cecum. (Ex. 16, p. 6.) Early symptoms of intussusception in infants include vomiting, bloody stool, abdominal pain, intermittent crying due to abdominal pain, and prolonged periods of lethargy. (*Id.*; Tr. 31-32.) Dr. Andreae explains that understanding how an infant communicates subjective pain is an important diagnostic skill as abdominal pain often manifests in infants as fussiness or withdrawal, an inability to be soothed, positioning the body in a curled-up position, and refusal to eat. (Tr. 34-35.) Later symptoms include abdominal distension, decreased bowel sounds, bilious vomiting, and "a red currant jelly-like stool."[9] (Ex. 16, p. 6; Tr. 32-33.) Abdominal ultrasound is the test of choice for diagnosing intussusception in children. (Ex. 16, p. 6.) An air or contrast enema can be utilized as both a diagnostic tool and, in some cases, as a therapeutic tool as pressure introduced by the enema can assist in unfolding the intestine. (*Id.*) When an enema is unsuccessful in correcting intussusception, surgery is required. (*Id.*) If detected and treated early, the prognosis for intussusception is excellent. (*Id.*) However, if intussusception is left untreated, it can result in death within two to five days. (*Id.*) Dr. Andreae states that "[t]he longer the intestine segment is folded into and squeezed by another segment, the longer it goes without a blood supply, increasing the risk of bowel ischemia and necrosis." (*Id.*)

Dr. Andreae maintains that proposed causes of intussusception in pediatric patients include the rotavirus vaccine, enteric adenovirus, and other enteric infections. (Ex. 16, p. 6.) She suggests that possible mechanisms of intussusception in children include lymphoid hyperplasia, alterations in gastrointestinal motility, and inflammation in the gastrointestinal tract. (*Id.*) Dr. Andreae explains that naturally occurring patches of lymphoid tissue found in the intestines, particularly the ileocecal region, serve as a critical site for the initiation of the immune response. (*Id.*) While some experts view this lymphatic tissue as physiologic in young children, Dr. Andreae maintains that recent studies suggest that children with a general tendency for lymphoid hyperplasia may have an increased risk of developing intussusception. (*Id.* (citing Hanne Vestergaard et

---

abstracts. (*Id.* at 15-17.) Dr. Andreae's research focuses on immunization policy and the perceived safety of vaccines in the U.S. and other developed countries. (Ex. 16, p. 3.) Dr. Andreae was proffered during the hearing as an expert in pediatrics, primary care of infants and children, and in the matter at issue in this case without objection. (Tr. 27.)

[9] During the hearing, Dr. Andreae explained that "red currant jelly-like stool" is stool that has mucus with blood in it. (Tr. 189-90.) She further explained that, when blood clots are present in the blood, she considers the clots to be a "sort of gelatinous material" that is consistent with the "red currant jelly-like stool." (*Id.*)

al., *Association Between Intussusception and Tonsil Disease in Childhood*, 19 EPIDEMIOLOGY 71 (2008) (Ex. 18)); Tr. 137.) She opines that Vestergaard et al. found that "intussusception may more likely be a hyperactive immune response to an infectious agent," highlighting how this response decreased with administration of steroids, a known immunosuppressant. (Tr. 137-38.) Regarding lymphoid hyperplasia, Dr. Andreae explains that "[t]hese enlarged patches of lymphatic tissue in the intestine are thought to act like a leading edge for the invagination of one portion of the intestine into the adjacent section." (Ex. 16, p. 6.)

While Dr. Andreae admits that the exact mechanism by which rotavirus vaccinations can cause intussusception remains unclear, she states that a thickening of tissue in the bowel wall may act as a lead point. (Ex. 16, p. 8 (citing Ward D. O'Sullivan & Charles G. Child, *Ileocecal Intussusception Caused by Lymphoid Hyperplasia*, 38 J. PEDIATRICS 320 (1951) (Ex. 23)).) However, she proposes three potentially causal mechanisms. (*Id.* at 9; Tr. 124.) First, she explains that rotavirus infection has been shown to result in increased thickness of the distal ileal wall and enlarged lymph nodes during the acute illness period. (Ex. 16, p. 9 (citing Christine G. Robinson et al., *Evaluation of Anatomic Changes in Young Children with Natural Rotavirus Infection: Is Intussusception Biologically Plausible?*, 189 J. INFECTIOUS DISEASES 1382 (2004) (Ex. 24)); Tr. 124.) Second, Dr. Andreae suggests that enterotoxins and endotoxins from the gut biome slow peristalsis and that rotavirus enterotoxins may inhibit peristalsis. (Ex. 16, p. 9 (citing Irving Sherman et al., *Paradoxical Intestinal Inhibitory Effects of Staphylococcal Enterotoxin*, 53 GASTROENTEROLOY 71 (1967) (Ex. 25); Trudy Murphy et al., *Intussusception Among Infants Given an Oral Rotavirus Vaccine*, 344 NEJM 564 (2001) (Ex. 19); Tr. 125, 141-42.) Third, she explains that the lipopolysaccharide endotoxin, a byproduct of the gut microbiome, is a known trigger for intussusception and that the enterotoxin from the rotavirus is both necessary to provide immunity following infection or vaccination and believed to cause profuse watery diarrhea. (Tr. 127-28.) She cites a mouse model showing that rotavirus infection exacerbates the early inflammatory response to lipopolysaccharide, leading to an increased rate of intussusception and suggesting a synergistic effect on the induction of intussusception. (Ex. 16, p. 9 (citing Kelly L. Warfield et al., *Rotavirus Infection Enhances Lipopolysaccharide-Induced Intussusception in a Mouse Model*, 80 J. VIROLOGY 12377 (2006) (Ex. 26)); Tr. 125, 128, 142-43.)

Dr. Andreae opines that the orally administered RotaTeq vaccine stimulates an immune response that is similar to the rotavirus infection. (Tr. 132-33.) She cites an article by Aziz et al., which investigated how oral vaccines trigger an immune response and specifically identified the RotaTeq vaccine as one such oral vaccine. (Tr. 139 (citing Mohd Aziz et al., *Oral Vaccines: New Needs, New Possibilities*, 29 BIOESSAYS 591 (2007) (Ex. 41)).) The authors observed that intestinal epithelial surfaces are one of the key elements involved in controlling the immune response to a vaccine antigen or infectious agent that is delivered by the oral route. (*Id.* at 139-40.) She quotes the authors as finding that "the specialized antigen-transporting epithelial M cells in the FAE overlying the gut-associated lymphoid tissue . . . constitute the primary target site for the oral delivery of vaccines." (*Id.* at 140 (quoting Aziz et al., *supra*, at Ex. 41).) Thus, Dr.

Andreae opines that orally administered vaccines, such as RotaTeq, activate intestinal lymph tissue as the mechanism to generate immunity. (Ex. 37, p. 8 (citing Aziz et al., *supra*, at Ex. 41); Tr. 140-41.)

Dr. Andreae emphasizes that, when the RotaTeq vaccine was first introduced in 2006, the package insert included a precaution against administering the vaccine to individuals with a history of intussusception. (Tr. 121.) Then, around 2011 or 2012, the package insert precaution was upgraded to a contraindication. (*Id.* at 121-22.) Additionally, Dr. Andreae states that, despite noting that signs of intussusception would usually occur during the first week after receiving the first or second dose of the rotavirus vaccine, the Vaccine Information Sheet instructs parents and caregivers to look for these signs any time after vaccination, which implies that intussusception may follow any dose. (Ex. 16, p. 9; Tr. 123.) Dr. Andreae further stresses that healthcare providers are mandated by federal law to provide this form to parents and caregivers before each dose of the rotavirus vaccine, not just the first and second dose. (Ex. 16, p. 9.) Notably, Dr. Andreae opines that the individual doses are the same in quantity and makeup. (Tr. 111.)

With regard to epidemiology, Dr. Andreae opines that studies assessing dose-specific risk of intussusception following the rotavirus vaccine encounter several major challenges. (Ex. 34, pp. 1-3.) First, age presents a strong confounding effect as both vaccination and the risk of intussusception are dependent on age. (*Id.* at 1.) Specifically, the recommended ages for the RotaTeq vaccination series in the U.S. is two months, four months, and six months, and the risk of intussusception significantly increases over time from a low at two months of age to a peak at six months of age. (*Id.* at 1-2.) Moreover, studies assessing dose-specific risk are often underpowered to confidentially draw conclusions on data by dose, especially with regard to later doses. (*Id.* at 2.) The number of children receiving the first dose of a multi-series vaccine will always be higher than the number of children receiving subsequent doses due to various issues, including contraindication. (*Id.*) She explains that the RotaTeq vaccine is contraindicated for children with a history of intussusception due to the recurrence risk associated with the condition. (*Id.*) The risk of recurrence is 7.5%-12.7% with most recurrences occurring more than 72 hours after treatment and resolution of the initial intussusception event. (*Id.* (citing Matthew Gray et al., *Recurrence Rates After Intussusception Enema Reduction: A Meta-Analysis*, 134 PEDIATRICS 110 (2014) (Ex. 35)).) Moreover, the risk of recurrence increases with each subsequent intussusception event, with the rate of recurrence risk being as high as 37.7% after the second event and 68.4% after the third event. (*Id.* (citing Wei-Lun Hsu et al., *Recurrent Intussusception: When Should Surgical Intervention be Performed?*, 53 PEDIATRICS & NEONATOLOGY 300 (2012) (Ex. 36)).) Thus, Dr. Andreae opines that the contraindication of administering RotaTeq vaccines to infants with a history of one intussusception event effectively excludes predisposed individuals – infants with a greater risk of intussusception – from the studied population. (*Id.*; Tr. 112.) Because of the age of distribution of intussusception in infants (*i.e.*, a 2-month-old infant is less likely to experience intussusception than a 4-month-old, who is less likely to experience intussusception than a 6-month-old), the contraindication is more likely to impact the

number of infants receiving the third dose and, to a lesser extent, the second dose of the RotaTeq vaccine. (Ex. 34, p. 2.)

Dr. Andreae discusses four studies regarding the dose-specific risk of intussusception and explains how the design of the study, as well as the exclusion of predisposed individuals due to the contraindication, limit the significance of the study findings. (*Id.* at 4-6 (citing Sylvie Escolano et al., *Intussusception Risk After RotaTeq Vaccination: Evaluation from Worldwide Spontaneous Reporting Data Using a Self-Controlled Case Series Approach*, 33 VACCINE 1017 (2015) (Ex. A, Tab 11); Penina Haber et al., *Intussusception After Rotavirus Vaccines Reported to US VAERS, 2006-2012*, 131 PEDIATRICS 1042 (2013) (Ex. 20); Irene M. Shui et al., *Risk of Intussusception Following Administration of a Pentavalent Rotavirus Vaccine in US Infants*, 307 JAMA 598 (2012) (Ex. A, Tab 13); W. Katherine Yih et al., *Intussusception Risk After Rotavirus Vaccination in U.S. Infants*, 370 NEJM 503 (2014) (Ex. 21)).) With respect to the study by Escolano et al., Dr. Andreae stresses that respondent's experts fail to appreciate that the authors concluded that the RotaTeq vaccine "marginally" increases the risk of intussusception after the second and third doses. (Ex. 31, p. 2 (citing Escolano et al., *supra*, at Ex. A, Tab 11); Tr. 105-06.) She notes that, in coming to this conclusion, the authors neither mention the potential impact of the exclusion of susceptible individuals from second and third doses of the RotaTeq vaccine, nor do they make any efforts to control for this impact when trying to understand the potential reasons behind the lower, yet still marginal, risk following the second and third doses. (Ex. 34, p. 5.) Haber et al. found some clustering after the first dose, and although they did not observe similar clustering after the second or third doses, the authors concluded that an association is plausible without specifying whether the association is applicable to any particular dose. (*Id.* (citing Haber et al., *supra*, at Ex. 20); Tr. 109-11.) However, the study is underpowered as it pertains to the third dose because the study's self-controlled risk interval method, in the context of the risk of intussusception following the first dose and the attendant contraindication for future doses, limited the pool of susceptible individuals who received subsequent doses. (Tr. 110-12; Ex. 34, p. 5.) Similarly, in a cohort study by Shui et al., the authors concluded that their study was underpowered to determine dose specific risk and that the possibility of a very low-level risk could not be excluded. (Ex. 34, p. 5 (citing Shui et al., *supra*, at Ex. A, Tab 13); Ex. 31, p. 2; Tr. 114-15, 118, 120.) Finally, Yih et al. found an association between RotaTeq vaccination and intussusception after the first dose, with the highest risk of onset between 3 and 7 days post-vaccination; however, they too could not rule out an increased risk associated with subsequent doses. (Ex. 34, pp. 5-6 (citing Yih et al., *supra*, at Ex. 21).) In sum, Dr. Andreae opines that the takeaway from these studies with regard to the third dose of the RotaTeq vaccine is that "the absence of evidence is not to be taken as the evidence of absence." (Tr. 107.)

Dr. Andreae stresses that, prior to receiving the third dose of the RotaTeq vaccine, L.C. had no symptoms indicative of bowel obstruction or intussusception. (Ex. 16, p. 10.) Based on her review of the medical records, Dr. Andreae opines that L.C. developed symptoms consistent with intussusception and associated significant gastrointestinal difficulties, which were later confirmed by ultrasound, within seven days

of administration of the third dose of the RotaTeq vaccine. (Ex. 16, pp. 5, 9, 10; Ex. 31, p. 5; Ex. 37, p. 9; Tr. 29-30.) Additionally, L.C. had clinical findings of lymphoid hyperplasia, hypoactive bowel sounds indicative of decreased peristalsis, and laboratory markers suggesting an increased inflammatory response, which Dr. Andreae opines were more likely than not associated with L.C.'s intussusception. (Ex. 16, p. 10.)

Dr. Andreae disagrees with Dr. Liacouras's opinion that L.C. had not yet developed intussusception when she first presented to JFK Medical Center on July 28, 2018. (Ex. 37, pp. 5-7.) She first cautions against overreliance on the initial abdominal ultrasound, which was found to be normal, explaining that ultrasounds are "an operator-dependent modality in which lack of training and experience by the sonographer and/or radiologist can lead to lower diagnostic accuracy," especially in young children who may be crying and uncooperative. (*Id.* at 6; Tr. 48-49.) She emphasizes that JFK Medical Center is not a pediatric hospital, which would suggest that they do not have pediatric radiologists on staff and that their ultrasound sonographers would likely get minimal exposure to pediatric patients. (Ex. 37, pp. 5-6.)

Second, Dr. Andreae argues that Dr. Liacouras disregards key facts in L.C.'s medical records that demonstrate that L.C.'s symptoms, specifically vomiting, diarrhea, and fever, first developed approximately four days prior to her presentation to the emergency room. (Ex. 31, p. 1.) She points to documentations in the medical records indicating that L.C. started to experience vomiting and diarrhea on July 24, 2018, as well as an episode of bloody stool on July 27, 2018. (Ex. 16, p. 9; Ex. 37, p. 5.) L.C.'s nasogastric tube contents were described as green, which suggests to Dr. Andreae that L.C. could have had a downstream obstruction that was causing bile to begin accumulating upstream and into the stomach. (*Id.* at 49-50.) L.C.'s abdominal x-ray also showed distension of the mid-abdomen small bowel loops, which would also suggest that an obstruction was present. (*Id.* at 50-51.) Although Dr. Andreae did not accept that the family's lay reports of "diarrhea" would necessarily be consistent with the medical understanding of diarrhea (*Id.* at 40-42, 92-93, 165-67, 169-70, 197), she opines that, if credited, those reports of diarrhea can be explained by post-vaccinal transmission of the rotavirus from L.C.'s stool, likely following diaper changes (*Id.* at 95-96, 197-98). Additionally, L.C.'s neurologic symptoms, including lethargy and seizure, are not confounding as such symptoms have been found to be a predominant sign of intussusception in infants under the age of one. (Ex. 37, p. 6 (citing Julian Orenstein, *Update on Intussusception*, 3 CONTEMP. PEDIATRICS 180 (2000) (Ex. 39)).)

Third, Dr. Andreae argues that the severity of L.C.'s intussusception at the time of confirmed diagnosis supports a conclusion that her intussusception developed prior to her arrival at JFK Medical Center on July 28, 2018. (Ex. 37, p. 6.) For example, L.C. developed a fever of 102.8 degrees Fahrenheit in the hours after her intussusception was confirmed and her intussusception could not be reduced with barium enema. (*Id.* (citing Ex. 12, pp. 17, 28).) During surgery, a significant portion of L.C.'s ileum was found to be grossly necrotic, and she suffered shock and cardiac arrest. (*Id.* (citing Ex. 12, pp. 20, 28).) Dr. Andreae opines that intussusception cannot cause intestinal necrosis and shock within hours after onset. (*Id.* at 7; Tr. 98.) Therefore, Dr. Andreae

opines that the evidence preponderates in favor of finding that L.C.'s intussusception was present and had been developing for several days by the time she presented to JFK Medical Center. (Ex. 37, pp. 5-7.)

On the issue of timing, Dr. Andreae cites the Vaccine Information Sheet, which states that signs of intussusception would usually occur during the first week after receiving the first or second dose of the rotavirus vaccine. (Ex. 16, p. 9; Tr. 123.) This information is in line with several reported cases of intussusception occurring during the first week after receipt of the third dose of the rotavirus vaccine. (Ex. 16, p. 9 (citing Stephan Foster, *Rotavirus Vaccine and Intussusception*, 12 J. PEDIATRIC PHARMACOLOGY & THERAPEUTICS 4 (2007) (Ex. 28)).) Dr. Andreae further cites the package insert for the RotaTeq vaccine, which supports a timeframe for post-vaccination intussusception of 1-21 days, with a clustering of cases within the first 7 days. (Tr. 143-44 (citing Highlights of Prescribing Information: RotaTeq (Rotavirus Vaccine, Live, Oral, Pentavalent) Oral Solution: Initial U.S. Approval: 2006 [hereinafter RotaTeq Package Insert] (Ex. 46; *see also* Court Exhibit I)).) While L.C.'s intussusception was not confirmed until July 29, 2018, Dr. Andreae argues that the onset of L.C.'s symptoms with vomiting on July 24, 2018, 7 days post-vaccination, occurred within a medically acceptable timeframe. (Ex. 16, p. 10.)

While she agrees that L.C. experienced onset of a respiratory viral illness on July 14, 2018, three days prior to vaccination, and that L.C. later tested positive for human metapneumovirus, Dr. Andreae disagrees with Dr. Liacouras's suggestion that this viral illness was the more likely cause of L.C.'s vomiting and diarrhea. (Ex. 37, pp. 2-3; Ex. 16, p. 10.) Dr. Andreae does not dispute that respiratory viral illnesses, including metapneumovirus, can cause gastrointestinal symptoms during the acute phase of infection. (Ex. 37, p. 3.) However, she stresses that neither human metapneumovirus infection nor any other primary respiratory infection has been associated with intussusception, and human metapneumovirus is rarely discovered in tissue outside of the respiratory tract. (Ex. 16, p. 10; Ex. 31, p. 2; Ex. 37, p. 3.) Moreover, such an infection in a young child would not present with mild respiratory symptoms for three days and then progress to gastrointestinal symptoms seven days later, and that Dr. Liacouras has failed to provide any evidence implicating the metapneumovirus as a cause of diarrhea and vomiting or gastrointestinal sequelae generally. (Ex. 16, p. 10.) With regard to the instant case, Dr. Andreae argues that documentation in the medical records during her emergency room encounter and subsequent hospitalizations suggest that L.C. did not have an acute respiratory infection at the time of the onset of her intussusception. (*Id.*) Specifically, Dr. Andreae stresses that L.C. was only reported to have a maximum temperature of 99 degrees Fahrenheit and was afebrile upon presentation to the ED. (*Id.* (citing Ex. 13, pp. 12-13).) While L.C. did have transient respiratory secretions, this was due to the fact that L.C. was post-ictal and sedated from the administration of Ativan, which can cause respiratory suppression in infants. (*Id.* (citing Ex. 13, p. 12).) Further, L.C.'s oxygen saturation levels and chest x-ray were both normal. (*Id.* (citing Ex. 13, p. 23).)

Dr. Andreae also disagrees with Dr. Liacouras's suggestion that another viral infection caused gastroenteritis or L.C.'s vomiting and diarrhea. (Ex. 37, p. 3.) She stresses that Dr. Liacouras's argument rests solely on subjective and conflicting accounts from family members that L.C. had infectious gastroenteritis and vague historical statements that the entire family had diarrhea. (*Id.* at 3-4; Tr. 92-94.) L.C.'s respiratory panel was only positive for metapneumovirus, and she emphasized that both the respiratory panel and the pathology staining of her resected bowel were both negative for adenovirus. (Ex. 37, p. 3; Ex. 16, p. 10 (citing Ex. 13, p. 25; Ex. 12, p. 142).) Additionally, there were also reports of L.C. experiencing lethargy, fever, and blood in her stool while at home – symptoms which were not shared by L.C.'s family members. (Ex. 37, p. 4 (citing Ex. 12, p. 14).) Dr. Andreae opines that these symptoms in a child of L.C.'s age are far more suggestive of intussusception compared to gastroenteritis. (*Id.*)

#### b. Respondent's Expert Pediatric Gastroenterologist, Chris A. Liacouras, M.D.[10]

Dr. Liacouras provided three expert reports and testified at the entitlement hearing. (Exs. A, B, D; Tr. 301-440.)

Dr. Liacouras opines that it is more likely than not that L.C.'s third dose of the RotaTeq vaccine did not cause or contribute to her intussusception and ultimate death. (Ex. A, p. 7.) He emphasizes that the risk of intussusception has only been significantly linked to the first dose during the first week after vaccination.[11] (*Id.* at 4.) However, he

---

[10] Dr. Liacouras received his medical degree from Harvard University in 1985. (Ex. A, Tab 1, p. 1.) Thereafter, he completed his internship and residency in pediatrics at Children's Hospital of Philadelphia. (*Id.*) He went on to complete a fellowship in pediatric gastroenterology and nutrition also at Children's Hospital of Philadelphia. (*Id.*) He is board-certified in pediatric gastroenterology and maintains his license to practice medicine in Pennsylvania. (*Id.* at 3.) Currently, Dr. Liacouras serves as a Professor of Pediatrics at the Perelman School of Medicine at the University of Pennsylvania and at Children's Hospital of Philadelphia, Division of Gastroenterology, Hepatology, and Nutrition. (Ex. A, p. 1; Ex. A, Tab 1, p. 2.) He evaluates pediatric patients with all types of disorders of the gastrointestinal system as a pediatric gastroenterologist at Children's Hospital of Philadelphia. (Ex. A, p. 1; Ex. A, Tab 1, pp. 2-3.) Additionally, Dr. Liacouras is the Medical Director of the Children's Hospital of Philadelphia Exton Specialty Center and Co-Director of the Center for Pediatric Eosinophilic Disorders. (Ex. A, Tab 1, pp. 2-3.) He previously served as Chairman and a National Councilor for the North American Society for Pediatric Gastroenterology, Hepatology and Nutrition and as Chairman for the Pediatric Endoscopy of the American Society of Gastrointestinal Endoscopy. (Ex. A, p. 1; Ex. A, Tab 1, p. 4.) Dr. Liacouras has co-authored approximately 85 peer-reviewed publications, 5 books, and numerous reviews, editorials, and book chapters. (Ex. A, Tab 1, pp. 9-25.) Dr. Liacouras was proffered during the hearing as an expert in pediatric gastroenterology without objection. (Tr. 307.)

[11] Dr. Liacouras describes how "a small, by significant number of cases of intussusception were reported to have occurred generally within 3 to 14 days after the first vaccine dose" of the RotaShield vaccine. (Ex. A, p. 4 (citing Julie E. Bines, *Rotavirus Vaccines and Intussusception Risk*, 21 CURRENT OPS. GASTROENTEROLOGY 20 (2005) (Ex. A, Tab 10)).) However, RotaShield was subsequently discontinued, and the primary rotavirus vaccines that are currently in use are RotaTeq, at issue in this case, and Rotarix. (*Id.*) He explains that the formulations of the RotaTeq and RotaShield vaccines are distinguishable. (Tr. 369-70.) Accordingly, Dr. Liacouras contends that any discussion of the RotaShield

describes multiple peer-reviewed reports demonstrating that there is no significant relationship between intussusception and receipt of the third RotaTeq vaccine. (*Id.* at 4-7.) He cites to a study by Escolano et al., which found a significant increase in intussusception within the first seven days after receiving the first dose of the rotavirus vaccine, but notes that the authors found no significant intussusception events after the second or third doses of the rotavirus vaccine. (*Id.* at 4 (citing Escolano et al., *supra*, at Ex. A, Tab 11).) Dr. Liacouras also discusses a study by Carlin et al., which found no suggestion of increased risk of intussusception after the third dose of the rotavirus vaccine. (*Id.* (citing John B. Carlin et al., *Intussusception Risk and Disease Prevention Associated with Rotavirus Vaccines in Australia's National Immunization Program*, 57 CLINICAL INFECTIOUS DISEASES 1427 (2013) (Ex. A, Tab 12, p. 1)).) He cites two more recent studies finding no risk for intussusception following any doses of the RotaTeq vaccine. (*Id.* at 5 (citing Shui et al., *supra*, at Ex. A, Tab 13; Kyu Yeun Kim & Dong Soo Kim, *Relationship Between Pentavalent Rotavirus Vaccine and Intussusception: A Retrospective Study at a Single Center in Korea*, 58 YONSEI MED. J. 631 (2017) (Ex. A, Tab 14)).) Moreover, he argues that a paper by Yih et al., which was cited by Dr. Andreae, reported the relative risk for developing intussusception after the third dose of the RotaTeq vaccine lacked statistical significance. (*Id.* at 6 (citing Yih et al., *supra*, at Ex. 21).)

Dr. Liacouras stresses that the cause of intussusception is unknown in the majority of cases, stating that approximately 90% of cases of infant intussusception are of unknown etiology. (Ex. A, p. 3; Ex. B, p. 3; Tr. 417.) However, he notes that viral illnesses, such as rotavirus and adenovirus infections, can cause intussusception. (Ex. A, p. 3.) Dr. Liacouras acknowledges that viral infections, namely, adenovirus and rotavirus, may cause inflammation or enlargement of lymphatic tissue, such as lymphonodular hyperplasia of the GI tract or mesenteric lymphadenopathy, creating a lead point for the development of intussusception. (*Id.* (citing Elizabeth A. Montgomery & Edwina J. Popek, *Intussusception, Adenovirus, and Children: A Brief Reaffirmation*, 25 HUM. PATHOLOGY 169 (1994) (Ex. A, Tab 6); Michael Buettcher et al., *Three-Year Surveillance of Intussusception in Children in Switzerland*, 120 PEDIATRICS 473 (2007) (Ex. A, Tab 7)).) He notes that approximately 30% of patients experience an antecedent viral illness before they develop intussusception. (*Id.*) As discussed in greater detail below, Dr. Liacouras contends that a viral illness is a more likely cause of L.C.'s intussusception. (*See, e.g.*, Ex. D, p. 8; Tr. 347.) However, on cross-examination during the hearing, Dr. Liacouras acknowledged that an article by Aziz et al. determined that oral vaccines, including the RotaTeq vaccine, can cause an immune response in the gut. (Tr. 407-48 (citing Mohd Azhar Aziz et al., *Oral Vaccines: New Needs, New Possibilities*, 29 BIOESSAYS 591 (2007) (Ex. 41)).)

While Dr. Liacouras concedes that lymphoid hyperplasia has been implicated as a potential cause of intussusception in rare cases, he argues that "it is pure speculation and hypothesis that lymphoid hyperplasia causes intussusception secondary to the rotavirus vaccine." (Ex. D, p. 6.) Dr. Liacouras contends that the presence of lymphoid

---

vaccine and its relationship to intussusception is irrelevant to the instant case. (Ex. A, p. 4; Ex. B, p. 3; Tr. 415.)

hyperplasia is not pathognomonic as the cause of intussusception unless the lymphoid hyperplasia is severe enough to be detected during the surgery. (Ex. B, p. 3; Tr. 342-43.) He stresses that a normal degree of lymphoid tissue is present in the ileum in almost all infants and children. (Ex. D, p. 6; Tr. 342.) Dr. Liacouras acknowledges that L.C.'s exploratory laparotomy in the pathology report revealed evidence of enlarged lymph nodes, ischemic ileocolitis with mucosal necrosis and inflammation, and lymphoid hyperplasia and ischemic necrosis of the ileum (Ex. D, p. 6), though the extent of the lymph tissue must not have been extensive as it was not noted in the surgical report (Tr. 341-43; *see also* Tr. 421). In response to questioning from the undersigned, Dr. Liacouras agreed that a comparison of the surgical report, which documented removal of about 10 centimeters of necrosis from the ileum and about 5-6 centimeters of necrosis from the colon, with the autopsy, which documented about 56 centimeters of necrosis in the small bowel, suggests that L.C.'s condition continued to progress following the surgery. (*Id.* at 356-58.) However, he states that there are many potential causes of these surgical findings, including infection, intestinal obstruction, reduced vascular blood flow, and vascular compromise. (Ex. D, p. 6.) Moreover, Dr. Liacouras contends that "[t]hese events often occur as a result, not a cause, of intestinal disease such as bowel death, ischemia, or obstructive conditions like intussusception which cause these areas to become inflamed and enlarged." (*Id.*)

Regarding L.C.'s clinical course, Dr. Liacouras opines L.C. experienced an upper respiratory infection, likely human metapneumovirus, prior to receiving the third dose of the RotaTeq vaccine. (Ex. D, p. 8; Tr. 308-09, 313-14.) While metapneumovirus typically causes symptoms similar to the common cold, it can cause vomiting, diarrhea, and fever in rare cases, as well as hyponatremia and seizure. (Ex. A, p. 3 (citing Jennifer E. Schuster & John V. Williams, *Human Metapneumovirus*, 34 PEDIATRICS REV. 558 (2013) (Ex. A, Tab 8)).) The viral infection can also cause infants to be fussy, sleepy, inactive, and feed poorly, leading to dehydration. (*Id.*) Dr. Liacouras opines that L.C. was still experiencing respiratory symptoms as evidenced by her physical exam findings of congestion, wheezing, and bronchospasms. (Tr. 314; *see also id.* at 309.) Although Dr. Liacouras opines that a respiratory illness could cause GI symptoms, he stresses the fact that L.C.'s family members also experienced diarrhea, which would suggest that there may be another infectious illness at play. (*Id.* at 313-14, 324.) Thus, he opines that L.C. may have developed an additional infectious illness that caused gastroenteritis within one week of her vaccination. (Ex. D, p. 8; Tr. 313-14.) Dr. Liacouras contends that "the combination of metapneumovirus and an unidentified gastrointestinal virus" likely caused hyponatremic dehydration, which then caused L.C. to suffer a seizure and "systemic sepsis kind of events," as well as neurologic compromise and a subsequent cardiac arrest. (Ex. D, p. 4; Ex. A, p. 7; Tr. 330-31, 346-47.) Dr. Liacouras explains that the gastrointestinal virus may have gone unidentified because children are treated in the same way, regardless of whether their symptoms are respiratory or gastrointestinal, and GI testing usually takes a couple of days to process. (Tr. 322-24.)

Dr. Liacouras explains that, once L.C. was hospitalized following her seizure, her physical exam findings were not concerning for intussusception. (Tr. 316-20, 363-65.)

Specifically, he argues that the presence of bilious vomiting and possible blood in stool "is not pathognomonic for intussusception and was more likely caused by L.C.'s infectious illness, severe dehydration, or the resulting seizure disorder." (Ex. B, p. 2.) He further explains that the positive guaiac test would be concerning for a GI process that could be severe enough to cause bleeding in her bowel, but would not in and of itself be concerning for intussusception. (Tr. 332-33.) Although Dr. Liacouras notes that reports of bloody stools are always concerning for intussusception, infections can also cause bleeding. (*Id.* at 312-13, 320.) L.C.'s abdominal x-ray findings were consistent with what is commonly seen in children with viral illnesses and did not show any evidence of mechanical obstruction, which would be present if the intussusception was causing her symptoms. (*Id.* at 325-28, 347.) The initial abdominal ultrasound similarly lacked evidence of intussusception, and Dr. Liacouras emphasizes that ultrasounds have an accuracy of "close to 100 percent." (*Id.* at 329-30.) Taken together, Dr. Liacouras opines that L.C.'s presentation is consistent with a systemic reaction, likely involving gastrointestinal symptoms, dehydration, sepsis, and seizure. (*Id.* at 330, 346-47.) He specifically opines, contrary to the death certificate, that L.C. likely experienced sepsis due to her dehydration and prior to her seizure. (*Id.* at 396-97.)

In sum, Dr. Liacouras opines that L.C. suffered a multi-factorial, systemic reaction following a viral infection that began with hyponatremic dehydration. (Tr. 330, 346-47, 380-81.) He opines that this "cascade of events" eventually resulted in intussusception and necrotic bowel, though he could not say when L.C. developed necrosis. (Tr. 347-48.) He notes that onset of necrosis is supported by L.C.'s fever on the day of surgery, her bleeding, and the hypoactivity of her bowel. (*Id.* at 348, 350.) While necrotic bowel typically "takes a while" to develop, Dr. Liacouras opines that it is often the case that necrotic bowel develops without any evidence of intussusception. (*Id.* at 348-49.) Regarding the onset of L.C.'s intussusception, Dr. Liacouras stresses that L.C.'s initial ultrasound, which was negative for intussusception, cuts against Dr. Andreae's conclusion that L.C. had a developing intussusception when she presented to the emergency room. (Ex. B, p. 2; Ex. D, p. 5.) He thus suggests that L.C.'s dehydration could have caused her ultimate condition, unrelated to her intussusception, or that the dehydration could have been "a contributing factor" in causing her intussusception by exacerbating inflammation in the intestinal tissue. (Ex. A, p. 7; Ex. D, p. 4.) In Dr. Liacouras's opinion, onset of L.C.'s intussusception did not occur until blood clots were observed in L.C.'s stool during her hospitalization and a second ultrasound revealed intussusception. (Tr. 330-33, 335, 383.) He contends that intussusception could develop within 24 hours if "it was caused by a focal lesion, like a necrotic bowel." (*Id.* at 399-400.) Therefore, Dr. Liacouras stresses that L.C.'s intussusception did not develop until 11-12 days post-vaccination. (Ex. A, p. 6; Ex. B, pp. 2, 8.)

### c. Respondent's Expert Epidemiologist, Heather McKay, Ph.D.[12]

---

[12] Dr. McKay received her master's degree in public health from Columbia University in 2008, and her Ph.D. in epidemiology from Johns Hopkins University in 2014. (Ex. C, Tab 1, p. 1.) She currently serves as an Associate Research Professor in the Department of Epidemiology at Johns Hopkins University

Dr. McKay provided one expert report and testified at the entitlement hearing. (Ex. C; Tr. 228-300.)

Dr. McKay begins by noting that the contraindication for the RotaTeq vaccination in the U.S. was not approved by the FDA and updated by the CDC until 2011. (Ex. C, p. 3.) However, with the exception of the study by Escolano et al., the cited studies, specifically, Yih et al., Shui et al., and Haber et al., all relied on data predominantly collected before 2011, when the contraindication was instated. (*Id.*) Accordingly, Dr. McKay opines that it would not have been possible for the contraindication to have skewed the results in those studies because the contraindication was not in effect when the majority of the data was obtained. (*Id.*; Tr. 246-48.)

Next, Dr. McKay addresses some of Dr. Andreae's critiques of the studies by Escolano et al., Haber et al., Shui et al., and Yih et al. (Ex. C, pp. 6-13; Tr. 253-77.) As an overview, Dr. McKay explains that epidemiology "is, at its heart, an estimation science, it's not a deterministic science." (Tr. 250.) She notes that epidemiology is not intended to provide an absolute "yes or no" answer, but when several studies of different designs and populations all converge to find similar results, it strengthens the confidence that the results are real and not statistical artifacts. (*Id.*) She opines that the consistency of the results in the cited studies suggests to her that there is a small significant risk of intussusception following the first dose of the RotaTeq vaccine. (*Id.* at 277.) However, no risk was detected following the third dose. (*Id.*) And, although she states that epidemiology "cannot prove zero risk, we can only say we don't detect it" (*Id.* at 248), she also asserts that the absence of evidence does not equate to evidence of harm. (*Id.* at 277-78.) In other words, "[j]ust because we are not seeing anything is not an assumption that there's something that we are missing." (*Id.* at 278.)

With respect to Dr. Andreae's comment about the strong confounding effect of age presenting as a major challenge for these studies, Dr. McKay opines that the investigators in Shui et al. and Yi et al. both utilized appropriate analytical methods to control for the potential confounding effect of age. (Ex. C, pp. 6-7; Tr. 275.) Dr. McKay emphasizes that the study investigators in Yih et al. and Shui et al., which were both cohort studies, clearly pre-specified that the primary outcome of interest was a first intussusception. (Ex. C, p. 4.) Accordingly, once an infant experiences their first intussusception, they have had the event of interest and thus no longer considered "at risk" in the study. (*Id.*) For subsequent doses, the only infants who are at risk at the start of the time interval after the second or third doses are infants who do not have a history of intussusception. (*Id.*) Therefore, in studies with primary outcome of interest

---

Bloomberg School of Public Health with a joint appointment in the Public Health Studies program at the Zanvyl Krieger School of Arts and Sciences at Johns Hopkins University. (*Id.*; Ex. C, p. 1; Tr. 230.) Dr. McKay has co-authored more than 26 peer-reviewed articles, 3 books or monographs, and 2 additional publications that were not peer-reviewed. (Ex. C, Tab 1, pp. 5-8; Tr. 231-32.) Her research is focused on infectious disease epidemiology, specifically in the context of understanding and reducing the impact of chronic health conditions that affect people living with HIV, and the effects of a broad range of early environmental influences on child health and development. (Ex. C, p. 1; Tr. 231.) Dr. McKay was proffered as an expert in epidemiology without objection. (Tr. 235.)

of first intussusception, participants are removed from the "at risk" set once they experience their first intussusception for both comparison groups and across all doses. (*Id.*) Thus, Dr. McKay opines that the estimates in Yih et al. and Shui et al. would not be skewed because this exclusion for the "at risk" group occurs in both comparison groups. (*Id.*) Moreover, Dr. McKay opines that the analytic study population in studies looking at whether RotaTeq is a risk factor for recurrent episodes of intussusception would need to be comprised of only infants who have a history of intussusception but, given the contraindication, she emphasizes that such a study design would be unethical. (*Id.* at 5.) Dr. McKay opines that Yih et al. and Shui et al. appropriately interpreted their findings that the risk of incident of a first episode of intussusception following the second and third doses of the RotaTeq vaccination is quite low and statistically nonsignificant. (*Id.*)

Dr. McKay opines that self-controlled case series and self-controlled risk intervals are both legitimate designs in the epidemiologic toolkit and have notable advantages over cohort studies in some cases. (Ex. C, pp. 7-8.) Specific to this case, Dr. McKay argues that these designs are much more efficient for rare events, such as intussusception, and there are validated statistical extensions that can be used to help control for potential false positives and improve the power of the study to detect a signal for a particular hypothesis. (*Id.* at 8.) While Escolano et al. used data on spontaneous reports of intussusception to RotaTeq vaccination manufacturers, Dr. McKay notes the study investigators applied precise, practical, and pre-specified risk intervals of interest. (*Id.* at 8-9; Tr. 266-69.) Moreover, Dr. McKay contends that the design of self-controlled case series is advantageous in that "by denoting a control window that is post-vaccination[,] it is able to reduce the 'healthy vaccinee' effect (HVE), common to pre-risk control windows – a vulnerability that is especially true for vaccinations of early infancy." (Ex. C, p. 9.) Another strength of the study is the use of a peer-reviewed and validated extension to the self-controlled case series model to account for the fact that the likelihood of reported events is unlikely to be independent of vaccination, which revealed that data was not affected by either age or dose. (*Id.*) Although Escolano et al. found a statistically significant risk within 3-7 days after the first dose and no statistically significant risk after the second and third doses, they could not rule out the possibility of a null hypothesis. (Tr. 268.) Dr. McKay explains that this study represents "another signal, it's not definitive, because in [epidemiology], we rarely include any one study as definitive, we try to look at sort of the totality of the evidence, but it's informative." (*Id.* at 268-69.)

Dr. McKay disputes Dr. Andreae's argument that retrospective cohort studies start with the outcome and work backward to assess the temporal relationship between the exposure and outcome. (Ex. C, p. 9.) She explains that, in retrospective cohort designs, a cohort is identified and assembled on the basis of preexisting records and is then followed in present time. (*Id.* at 9-10.) Exposure is ascertained from past records, and the outcome is determined when the study is initiated. (*Id.* at 10.) She also maintains that retrospective cohort studies can control for potential confounding variables in the same way that prospective or concurrent cohort studies can. (*Id.*) While Dr. McKay concedes that there may be quality issues regarding the historical

records, which may limit the ability to account for confounding variables, she argues that all studies are vulnerable to data quality issues. (*Id.* at 10-11.) However, she describes cohort studies as "a bedrock research design in epidemiologic research." (*Id.* at 9.)

Haber et al. utilized VAERS data to examine daily reporting rates of intussusception following RotaTeq vaccination. (Ex. C, p. 14; Tr. 253.) Dr. McKay notes that, while VAERS is a useful reporting tool and may suggest that something is worth looking into, it is not sufficient to draw causal conclusions given its significant limitations. (Ex. C, pp. 13-14.) Specifically, she argues that VAERS has significant data quality issues because it accepts reports that may be nonstandard, inconsistent, unverifiable, and include missing data; it only includes cases of adverse events but does not factor in the total number of people receiving the vaccine or doses received; there is no control group; and it is subject to considerable reporting and information biases. (*Id.*; Tr. 253-55, 264-65.) While she admits that temporality is a critical and essential element to demonstrating causation, Dr. McKay stresses that the causal argument must be corroborated with other evidence from biologic, clinical, and epidemiologic studies. (Ex. C, p. 14.) Regarding Haber et al., Dr. McKay opines that this study found no significant clustering of reports following the second and third dose of the RotaTeq vaccine. (*Id.*) She states that this studies findings suggest the existence of a signal that warrants further investigation (*Id.*); however, Dr. McKay "would not use this [study] solely to support causal inference. They are early warning studies. You, in my mind, always need to verify them or clarify them or investigate them further with traditional epidemiologic studies . . . ." (Tr. 264; Ex. C, p. 14.)

## V. Discussion

### a. *Althen* prong one

Under *Althen* prong one, petitioner must provide a "reputable medical theory," showing that the subject vaccine can cause the type of injury alleged. *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355-56 (Fed. Cir. 2006) (quoting *Pafford v. Sec'y of Health & Human Servs.*, No. 01-0165V, 2004 WL 1717359, at *4 (Fed. Cl. Spec. Mstr. July 16, 2004)). Such a theory need only be "legally probable, not medically or scientifically certain." *Knudsen v. Sec'y of Health & Human Servs.*, 35 F.3d 543, 548-49 (Fed. Cir. 1994). Petitioner may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or a generally accepted medical theory. *See Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1378-79 (Fed. Cir. 2009) (citing *Capizzano v. Sec'y of Health & Human Servs.*, 440 F.3d 1317, 1325-26 (Fed. Cir. 2006)). However, "[a] petitioner must provide a 'reputable medical or scientific explanation' for [the proposed causal] theory. While it does not require medical or scientific certainty, it must still be 'sound and reliable.'" *Boatmon v. Sec'y of Health & Human Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019) (citation omitted) (first quoting *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 (Fed. Cir. 2010); then quoting *Knudsen*, 35 F.3d at 548-49). In all events, petitioner must demonstrate in totality that the vaccine at issue more likely than not can

cause the relevant disease. *Cerrone v. Sec'y of Health & Human Servs*., 146 F.4th 1113, 1122 (Fed. Cir. 2025).

Apart from certain cases with identifiable lead points, such as tumors, polyps, or congenital abnormalities, the pathophysiology of intussusception is not fully understood. (Ex. 16, p. 8; Ex. A, p. 3.) However, there is no dispute on this record that viral infection by enteric viruses (*i.e*., viruses that infect the intestine), including rotavirus, have been associated with intussusception and that they can likely cause intussusception by causing bowel abnormalities, including lymphonodular hyperplasia, mesenteric lymphadenopathy, or hypertrophy of the Peyer patches.[13] (Ex. A, p. 3; Ex. 16, p. 6; Tr. 421.) A publication cited by Dr. Liacouras explains that, in idiopathic cases, "lymphoid hyperplasia within the wall of the bowel is thought to produce the functional equivalent of a pathologic lead point. The terminal ilium is noted to be rich in gut-associated lymphoid tissue (GALT), and it is this tissue that likely initiates the intussuscepting process." Anthony T. Manning & Danny C. Little, *Intussusception in Infants and Children*, *in* ROBERT WYLLIE ET AL., PEDIATRIC GASTROINTESTINAL AND LIVER DISEASE 607 (2016) (Ex. A, Tab 2, p. 1.)

Given that background, Dr. Andreae reasonably theorizes on petitioner's behalf that the RotaTeq vaccine, which is administered as a series of three identical doses, can cause intussusception after any dose, likely as a result of a combined effect of an activated immune response, inflammation, and lymphoid hyperplasia, the same process theorized to explain how a rotavirus infection may cause intussusception. (Ex. 16, pp. 8-9; Ex. 37, p. 8; Tr. 124-28, 130-31, 139-43.) As a live, orally administered vaccine, it is particularly reasonable to conclude that the RotaTeq vaccine is capable of resulting in intussusception in the same manner as a rotavirus infection.[14] (Tr. 139-41.) Dr. Andreae presented the article by Aziz et al., as demonstrating that intestinal epithelial surfaces, and gut-associated lymphoid tissue in particular, are "the primary target site for the oral delivery of vaccines." (*Id*. (quoting Aziz et al., *supra*, at Ex. 41).) Dr. Liacouras agreed on cross-examination that the paper by Aziz et al. shows that oral vaccines cause an immune response in the gut. (Tr. 407-08; Aziz et al., *supra*, at Ex. 41.) Moreover, the package insert for the RotaTeq vaccine specifically confirms that vaccine recipients have been known to shed transmissible rotavirus in their stool.

---

[13] Peyer patches are aggregated lymphoid nodules of small intestine. *Peyer patches*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=96786 (last visited Sep. 29, 2026).

[14] *See, e.g., Alvarado v. Sec'y of Health & Human Servs*., No. 20-327V, 2026 WL 1229942, at *13 (Fed. Cl. Spec. Mstr. Apr. 9, 2026) (crediting, with other additional evidence, that the Institute of Medicine "indicates that as a general matter, the effects of the natural infection is one type, 'albeit minor,' of evidence supportive of a mechanism of causation"); *see also Gaskin v. Sec'y of Health & Human Servs*., No. 21-835V, 2025 WL 786306, at *11-12 (Fed. Cl. Spec. Mstr. Feb. 11, 2025) (distinguishing natural infection from the immune response to an attenuated live vaccine, but accepting that the live varicella vaccination can result in varicella infection that could in turn cause other complications in immunocompromised recipients). *But see Lee v Sec'y of Health & Human Servs*., No. 20-665V, 2026 WL 2687105, at *13 (Fed. Cl. Spec. Mstr. Aug. 10, 2026) (declining to credit the effects of a natural hepatitis A infection as evidence of the effects of the inactivated hepatitis A vaccine).

(RotaTeq Package Insert, *supra*, Ex. 46, p. 4; Tr. 389.) Further still, the package insert for the RotaTeq vaccine explicitly warns that the vaccine can cause intussusception based on a post-marketing observational study. (RotaTeq Package Insert, *supra*, Ex. 46, p. 4.) And, even setting aside the fact of the warning itself,[15] both the package insert and respondent's experts agree that an epidemiologic signal has been detected relative to the first dose of the RotaTeq vaccine.[16] (*Id.*; Ex. A, p. 4; Tr. 277.) And, indeed, it is notable that all three of the rotavirus vaccines that have been available in the U.S., the discontinued RotaShield, as well as the currently available RotaTeq and Rotarix, which are all live, oral vaccines, have all had detected epidemiologic signals for intussusception. (Manning & Little, *supra*, at Ex. A, Tab 2, p. 7.) Although Dr. Liacouras withholds his ultimate agreement as to any theory of vaccine causation (*e.g.*, Ex. D, p. 6), he does acknowledge that most of the theories that have sought to explain this epidemiologic signal regarding the first dose do relate to lymphonodular hyperplasia, which he otherwise agrees can be associated with a natural rotavirus infection. (Ex. A, p. 3; Ex. D, p. 8; Tr. 416.) All of this collectively is more than enough to preponderantly support a sound and reliable theory of causation implicating the RotaTeq vaccine broadly as a cause of intussusception.

Nonetheless, respondent seeks to single out the third dose for distinct treatment. (ECF No. 79, p. 11.) Respondent's experts suggest that, despite an epidemiologic signal for the first dose, it would be speculative to assume that every dose would have the same relative risk or that a causal mechanism explaining how the first dose could cause intussusception would be applicable to subsequent doses. (Tr. 248-49, 286-89.) However, during the hearing, both of respondent's experts testified that they do not have the immunologic expertise necessary to explain why the third vaccine dose – compositionally identical to the first – would be incapable of producing the same injury that they agree the first dose is capable of producing. (*Id.* at 248-49, 287-88, 368-69, 414, 417-48.) Both suggested that there is a material difference between the doses insofar as only the first dose is a naïve exposure (*Id.* at 248-49, 287-88, 417), but

[15] In some prior cases, special masters have concluded broadly that "[s]tatements contained in vaccine package inserts do not constitute reliable proof of causation, and cannot be deemed admissions that the vaccines in question have the capacity to harm a particular petitioner in a specific manner." *Sullivan v. Sec'y of Health & Human Servs.*, No. 10-398V, 2015 WL 1404957, at *20 (Fed. Cl. Spec. Mstr. Feb. 13, 2015) (citing *Werderitsh v. Sec'y of Health & Human Servs.*, No. 99-319V, 2005 WL 3320041, at *8 (Fed. Cl. Spec. Mstr. Nov. 10, 2005)); *see also* 21 C.F.R. § 600.80(n) (disclaiming that "[a] report or information submitted by an applicant under this section (and any release by FDA of that report or information) does not necessarily reflect a conclusion by the applicant or FDA that the report or information constitutes an admission that the biological product caused or contributed to an adverse effect"). It has also been observed, however, that the fact that package inserts are not admissions does not prevent them from including information that does have value, particularly information provided by the clinical trials described by the package insert. *Cottingham v. Sec'y of Health & Human Servs.*, 15-1291V, 2021 WL 347020, *23-26 (Fed. Cl. Spec. Mstr. Jan. 7, 2021), *vacated on other grounds*, 154 Fed. Cl. 790 (2021). Here, the warning is based on a separately discussed observational study.

[16] Some other studies of record have failed to detect such a signal. However, because respondent's experts do not dispute that a genuine signal exists relative to the first dose, it is not necessary to go into depth regarding the relative weight of the studies favoring or disfavoring an association between a first dose of RotaTeq and intussusception.

neither was able to articulate why this would be meaningful to intussusception. To that point, although the above-referenced post-vaccination viral shedding primarily occurs after the first dose of vaccine, the literature of record does document that it has also been observed following the third dose. (David O. Matson, *The Pentavalent Rotavirus Vaccine, RotaTeq™*, 17 SEMINARS PEDIATRIC INFECTIOUS DISEASES 195 (2006) (Ex. 32, p. 4); CTR. FOR DISEASE CONTROL & PREVENTION, DEP'T OF HEALTH & HUM. SERVS., RR-12, PREVENTION OF ROTAVIRUS GASTROENTERITIS AMONG INFANTS AND CHILDREN: RECOMMENDATIONS OF THE ADVISORY COMMITTEE ON IMMUNIZATION PRACTICES (ACIP) (2006) [hereinafter CDC Report on Rotavirus Gastroenteritis Among Infants & Children] (Ex. 44, p. 9).) Moreover, pressed by petitioner's counsel, both of respondent's experts demurred with respect to whether the fact that this vaccine is administered as a three-dose series is meaningful to assessing the immune response to each successive dose. (Tr. 287-88, 414, 417.)

Further still, the record evidence indicates that the medical community is less hesitant than respondent's experts in extending the perceived risk to all doses of the vaccine. The occurrence of intussusception following a previous dose is a contraindication for administration of a further dose (Ex. 34, p. 2; CDC Report on Rotavirus Gastroenteritis Among Infants & Children, *supra*, at Ex. 44, p. 11; Tr. 112, 121-23), strongly suggesting the conclusion that the second and third dose are capable of resulting in intussusception at least in a vulnerable recipient. (Tr. 104-05. *But see* Tr. 419-20.) And a pediatric textbook chapter on intussusception authored by Manning and Little and cited by Dr. Liacouras recommends that "clinicians should maintain an increased index of suspicion in patients presenting with the traditional symptoms of intussusception shortly after the administration of any dose of a rotavirus vaccine."[17] (Manning & Little, *supra*, at Ex. A, Tab 2, p. 7.)

Ultimately then, respondent's argument rests primarily on the assertion that there is robust epidemiology that essentially demonstrates that the third dose of RotaTeq does not carry any increased risk of intussusception. (ECF No. 79, p. 11.) A petitioner is not obligated to prove a case with epidemiology. *Capizzano*, 440 F.3d at 1325. Yet, "[n]othing in *Althen* or *Capizzano* requires the Special Master to ignore probative epidemiological evidence that undermines petitioner's theory." *D'Tiole v. Sec'y of Health & Human Servs.*, 726 F. App'x 809, 811 (Fed. Cir. 2018). Accordingly, I have considered the epidemiologic issue raised by respondent. Drs. McKay and Liacouras are both persuasive in noting that there are multiple epidemiologic studies that have

[17] Significantly, this recommendation is not specific to RotaTeq. The authors noted the prior history of increased intussusception following the discontinued RotaShield vaccine and also cited a study regarding the Rotarix vaccine that also showed a five-fold increase in intussusception. Regarding RotaTeq, they cited a study by Shui, et al., that has also been filed in this case. The textbook chapter cites Shui as finding "increases in intussusception over the expected baseline with any dose of the vaccine." (Manning & Little, *supra*, at Ex. A, Tab 2, p. 7.) This is true; however, review of the study itself indicates that the increase in cases over the expected baseline did not reach statistical significance. (Shui et al., *supra*, at Ex. A, Tab 13.) Despite this, and seeming to treat all versions of the rotavirus collectively, the authors articulated a broad-based caution to clinicians regarding all doses of all types of rotavirus vaccine. (Manning & Little, *supra*, at Ex. A, Tab 2, p. 7.)

been filed which have consistently found that the first dose of RotaTeq is unique in presenting a detectable epidemiologic signal. (Ex. A, p. 4; Tr. 277.) I agree with Dr. McKay that, although all studies have limitations, when viewed collectively the available literature provides good evidence that the first dose of RotaTeq is more likely than the third dose to result in a first intussusception. (Tr. 277.) However, respondent overstates the degree to which, especially in light of the evidence discussed above, this would therefore completely exonerate the third dose of any capacity to cause intussusception.

On this record, four studies that associated the first dose of RotaTeq vaccine with intussusception also included findings that failed to associate the third dose with any increased incidences of intussusception.[18] Two of those studies – Haber et al. and Escolano et al. – are based on data pulled from passive surveillance. During the hearing, Dr. McKay explained with respect to passive surveillance (and, in particular, the VAERS data on which Haber et. al. is based) that "[t]here are a lot of problems with data quality, missingness, completeness. It's susceptible to several biases, several reporting biases, and there's no denominator. And so you don't have a sense of who is at risk for the people that are actually reporting that they're having an event . . . ." (Tr. 254.) Dr. McKay indicated that Haber et al. is "not a causal inference study" and its findings must be taken "with a grain of salt." (*Id.* at 254, 264-65.) She did not discuss Escolano et al. in the same amount of detail, but noted that it suffers similar limitations to Haber et al. (*Id.* at 266.) Moreover, these limitations especially counsel against treating the Escolano study as definitive, because that study did find increased incidences of intussusception after all three doses, but found that only the incidences following the first dose reached statistical significance, characterizing the second and third doses as carrying a "marginally" increased risk of intussusception. (Escolano et al., *supra*, at Ex. A, Tab 11, pp. 1, 3.) Yet, Dr. McKay indicated the confidence intervals in this study show "statistical imprecision." (Tr. 293.) Accordingly, neither of these studies provides significant support for respondent's view.

Yih et al. examined 1,277,556 total doses of RotaTeq vaccine, including 507,874 first doses. (Yih et al., *supra*, at Ex. 21, p. 1.) Using two different methods, a self-controlled analysis and a cohort analysis, and also adjusting for age in multiple ways, the authors concluded that there is a "robust" finding of significant increased risk of intussusception after the first dose of RotaTeq. (*Id*. at 1, 8.) For the second and third doses, the cohort analysis did not detect any increased risk. (*Id*. at 5 tbl. 1.) The self-controlled model did include some findings of elevated risk for the second and third doses, but as with other studies discussed herein, they did not reach statistical significance. (*Id*.) However, a significant limitation of the study was that diagnosis could not be validated in 22% of initially ascertained cases due to lack of medical records. (*Id*. at 8.) The authors noted that the findings relative to the first dose were

[18] Petitioner additionally filed a fifth paper by Koch et al., which similarly found that only the first dose of RotaTeq is associated with an increased risk of intussusception. (Judith Koch et al., *Risk of Intussusception after Rotavirus Vaccination: A Systemic Literature Review and Meta-Analysis*, 114 DEUTSCHES ARZTEBLATT INT'L 255 (2017) (Ex. 22).) However, that paper was a meta-analysis of the four studies discussed herein. (*Id*. at 2-4.)

likely robust enough to withstand this limitation, but indicated that this limitation did affect the statistical power of the study and the confidence intervals for the self-controlled analyses. (*Id.* at 8-9.)

This caveat by the study authors is particularly interesting because the case-controlled analysis, unlike the cohort analysis, did show increased risk relative to the third dose that failed to reach statistical significance. During the course of this case, I had expressed concern that children with a predisposition to lymphonodular hyperplasia, which is relevant to petitioner's theory of causation, may be less likely to receive a third dose of the rotavirus vaccine (effectively screened out if they reacted to a first or second dose), potentially skewing the makeup of the population of third dose recipients. In response to that concern, Dr. McKay proposed that the self-control model is the better model for accounting for the possibility that "fixed confounders," such as, for example, a genetic susceptibility or, here, a predisposition to hyperplasia, might be a concurrent confounding factor. (Tr. 240-44, 250.) Yih et al. does seem to come closer to detecting an epidemiologic signal for the third dose using the case-controlled model over the cohort model; however, they had a limitation in their data collection that they called out as affecting both the power and confidence intervals for the case control analysis specifically. (Yih et al., *supra*, at Ex. 21, pp. 8-9.)

Finally, Carlin et al. examined 306 cases of intussusception. (Carlin et al., *supra*, at Ex. A, Tab 12, p. 1.) A self-controlled analysis found that the RotaTeq vaccine was associated with increased incidences of intussusception during the risk period for the first and second dose, but not the third. (*Id.* at 5 tbl. 2.) The odds ratio for a case-control analysis found a positive association for all three doses, but only the finding relative to the first dose reached statistical significance. (*Id*. at 5 tbl. 3.)

Ultimately, respondent's proffered epidemiologist, Dr. McKay, was very clear in testifying as to the limits of epidemiology. She explained that "[epidemiology] is, at its heart, an estimation science, it's not a deterministic science. So we come up with estimates and confidence in our estimates. Not absolute yes, absolute no." (Tr. 250.) "[Epidemiology] cannot prove zero risk, we can only say we don't detect it." (*Id*. at 248.) Thus, while she opined that the available epidemiology, especially when viewed in the aggregate, supports an "inference" [19] that the third RotaTeq dose is not causally meaningful, she stressed that the study findings themselves are limited to showing merely that the third vaccine dose does not cause intussusception more often than background rates. (*Id*. at 246, 248, 277.) Yet, the fact that an epidemiologic signal is not detected is not the same as indicating that no causal relationship exists. As Dr. McKay conceded during the hearing, absence of evidence is not evidence of absence. (*Id*. at 277-78.)

Thus, while this body of epidemiology clearly shows that the first dose of intussusception is more likely to be a cause of a first intussusception than a third dose, I do not find the available epidemiology to be dispositive of the lack of any causal

---

[19] Dr. McKay explained that in epidemiology, an "inference" is a qualitative conclusion as distinct from a numeric result, but that it stops short of assigning causation. (Tr. 251.)

relationship relative to the third dose or weighty enough without more to overcome Dr. Andreae's preponderantly supported theory of causation that otherwise applies to any dose of the vaccine. *See Grant*, 956 F.2d at 1149 (explaining that epidemiologic studies are probative, but not dispositive, of causation-in-fact); *Cerrone*, 146 F.4th at 1122 (explaining that *Althen* prong one is appropriately decided based on whether the overall weight of evidence balances out in the petitioner's favor). Instead, the fact that the third vaccine dose does not cause intussusception more often than background rates is considered below as part of the weighing of case specific factors under *Althen* prong two.

I am aware that prior cases have found the third dose of rotavirus vaccine was not preponderantly established as a cause of intussusception. *Reske v. Sec'y of Health & Human Servs.*, No. 19-131V, 2021 WL 5773711 (Fed. Cl. Spec. Mstr. Sep. 20, 2021); *Germaine v. Sec'y of Health & Human Servs.*, No. 18-800V, 2020 WL 8992815 (Fed. Cl. Spec. Mstr. Mar. 9, 2020), *mot. for rev. den'd*, 155 Fed. Cl. 226 (2021).[20] However, these conclusions were reached on different records.[21] Most notably, the special master in *Germaine* concluded that the petitioner had not substantiated a theory of causation, essentially leaving only the epidemiology to be evaluated, which the special master further found did not support the third dose as a cause of intussusception. In this case, however, petitioner has presented a preponderantly supported theory of causation, and so, the question is not whether the epidemiology affirmatively supports petitioner's case as was considered in *Germaine* and *Reske*, but whether the epidemiology undermines or rebuts petitioner's otherwise persuasive theory. The conclusion reached herein is consistent with both *Germaine* and *Reske* insofar as the above analysis agrees that the capacity of the third dose of RotaTeq to cause intussusception is not epidemiologically supported despite examination of that question. Rather, having considered respondent's presentation of an expert in epidemiology to discuss these studies, this ruling concludes only that the lack of an epidemiologic signal relative to the third vaccine dose is not dispositive under *Althen* prong one given both the limits of that data and the other evidence of record.

Accordingly, petitioner has met her preponderant burden of proof under *Althen* prong one.

### b. *Althen* prong three

Under the third *Althen* prong, a petitioner must demonstrate a "proximate temporal relationship" between the subject vaccination and the alleged injury. *Althen*, 418 F.3d at 1278. To do this, petitioner must provide "preponderant proof that the onset

---

[20] An additional decision concluded that a petitioner had been unsuccessful in establishing that a RotaTeq vaccine can cause intussusception. *Carda ex rel. G.J.C. v. Sec'y of Health & Human Servs.*, No. 14-191V, 2017 WL 6887368 (Fed. Cl. Spec. Mstr. Nov. 16, 2017). In that case, however, the special master addressed a theory that the rotavirus vaccine can cause "a series of transient, almost subclinical and self-resolving intussusceptions," which the special master distinguished from an "acute intussusception." (*Id.* at 19.)

[21] But in any event, these prior decisions are not binding. *Boatmon*, 941 F.3d at 1358.

of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact." *de Bazan v. Sec'y of Health & Human Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008).

The package insert for RotaTeq indicates that "cases of intussusception were observed in temporal association within 21 days following the first dose of RotaTeq, with a clustering of cases in the first 7 days." (RotaTeq Package Insert, *supra*, at Ex. 46, pp. 1, 4, 7.) This is likewise supported by Yih et al. (Yih et al., *supra*, at Ex. 21, p. 9 (finding a significant increase in the risk of intussusception within a 21-day risk window following the first dose of the RotaTeq vaccine with "a significant cluster of onset of intussusception 3 to 7 days after vaccination"); *see also* Haber et al., *supra*, at Ex. 20, p. 1 (noting "a persistent clustering of reported intussusception events 3 to 6 days after the first dose" of the RotaTeq vaccine).) And, while no similar finding is available relative to the third dose, for the reasons discussed under *Althen* prong one above, I find that there is inadequate evidence to distinguish the injury-causing capacity of each dose. Accordingly, the temporal relationship evidenced relative to the first dose of vaccine is the temporal relationship to be applied to all doses of the vaccine.

The parties have differing views as to onset of L.C.'s intussusception. Petitioner contends that onset of intussusception occurred at the time L.C. began vomiting, which was about 7 days post-vaccination. (Tr. 146.) Respondent contends, however, that onset of the intussusception occurred sometime between her first and second ultrasounds, which places onset at about 11-12 days post-vaccination. (*Id.* at 330-33, 335; Ex. A, p. 6; Ex. B, pp. 2, 8.) While the strongest temporal association is evidenced by a clustering of cases within 7 days, the evidence indicates that the period of risk extends for up to 21 days. Therefore, while petitioner's understanding of onset would favor a stronger temporal relationship to vaccination, a causal inference is appropriate under either party's understanding of the onset of the intussusception in this case.

Accordingly, petitioner has met her preponderant burden of proof under *Althen* prong three.

**c. *Althen* prong two**

The second *Althen* prong requires preponderant proof of a logical sequence of cause and effect, which is usually supported by facts derived from petitioner's medical records.[22] *Althen*, 418 F.3d 1278; *Andreu*, 569 F.3d at 1375-77; *Capizzano*, 440 F.3d at

[22] Medical records are generally viewed as trustworthy evidence. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). These records are generally contemporaneous to the medical events and "contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium." *Id.* However, medical records and/or statements of a treating physician's views do not *per se* bind the special master. § 300aa-13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Human Servs.*, 88 Fed. Cl. 706, 746 n.67 (2009) (reasoning that "nothing . . . mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted").

1326; *Grant*, 956 F.2d at 1148. While the opinions of treating physicians are often favored, *Capizzano*, 440 F.3d at 1326, a petitioner may support a cause-in-fact claim through presentation of either medical records or an expert medical opinion, *see* § 300aa-13(a). In this case, L.C.'s treating physicians were entirely silent as to the underlying cause of her condition, leaving *Althen* prong two as a battle of the parties' experts.

The Federal Circuit cautioned in *Capizzano* that the second prong of *Althen* "is not without meaning." 440 F.3d at 1326-27. However, the Federal Circuit also explained in *Capizzano* that the petitioner's satisfaction of *Althen* prongs one and three can be probative with respect to *Althen* prong two. *Id.* at 1326. Thus, it is significant to petitioner's *Athen* prong two showing that she has demonstrated that the third dose of RotaTeq can cause intussusception and that the onset of intussusception in this case occurred within a timeframe from which causation can be inferred.

The *Capizzano* Court described the circumstances in which *Althen* prong two may be a stumbling block as follows:

> There may well be a circumstance where it is found that a vaccine *can* cause the injury at issue and where the injury was temporally proximate to the vaccination, but it is illogical to conclude that the injury was actually caused by the vaccine. A claimant could satisfy the first and third prongs without satisfying the second prong when medical records and medical opinions do not suggest that the vaccine caused the injury, or where the probability of coincidence or another cause prevents the claimant from proving that the vaccine caused the injury by preponderant evidence.

440 F.3d at 1327.

In this case, the parties have very different interpretations of the available facts. Petitioner contends that L.C. first suffered intussusception approximately 7 days post-vaccination when she first started vomiting. (Tr. 42, 98.) According to her expert, Dr. Andreae, the onset of additional gastrointestinal symptoms (namely, diarrhea) was likely attributable to the vaccine itself, if credited. (*Id.* at 197-98.) However, she doubts the history of diarrhea provided by L.C.'s caregivers. (*Id.* at 40-42, 92-94, 165-67.) To the extent other family members also experienced diarrhea, she notes that the package insert for the RotaTeq vaccine indicates that vaccine recipients can pass rotavirus to others through their stool. (*Id.* at 95-97.) When L.C. first presented to the emergency department, her history of present illness, which also included a report of a prior bloody stool; her positive guaiac test; her physical exam findings of distended abdomen and hypoactive bowel sounds; and her x-ray were all consistent with intussusception. (*Id.* at 40-50, 67-68.) Only L.C.'s first ultrasound was inconsistent with intussusception, though that was insufficient for the treaters to remove intussusception from the

differential diagnosis.[23] (*Id.* at 68-69.) After L.C. passed a bloody, clotted stool, the second ultrasound confirmed the intussusception. The fact that L.C.'s later surgical findings confirmed necrotic bowel at the point of the intussusception confirms that L.C. suffered a long-standing intussusception over days. (*Id.* at 59, 98.) Thus, she opines that L.C.'s third dose of rotavirus vaccine resulted in an intussusception and her death. (*Id.* at 143.)

Respondent's expert, however, contends that L.C. suffered either one or two viral infections – the confirmed upper respiratory human metapneumovirus infection, as well as the diarrheal illness that affected multiple family members. He stresses that L.C. came to medical attention because she had experienced a seizure as a result of dehydration brought on by these illnesses and that, at the time she presented to the emergency department, she was noted to be in critical condition and, in particular, already experiencing a sepsis-like presentation. Dr. Liacouras opines that L.C.'s initial presentation, with a prior bloody stool, positive guaiac, physical exam findings, and abdominal x-ray, are consistent with L.C. experiencing intestinal sequelae of her condition in the context of a multi-system failure, but not necessarily indicative of intussusception in particular. (Tr. 319-20, 325-33, 346-51, 380-88.) He opines that, as a consequence of her grave condition, L.C.'s bowels may have been compromised upon her initial presentation to the emergency department, but that it was only later, after the first ultrasound, that L.C.'s necrotic bowel formed the lead point for an intussusception to develop, as ultimately detected by her second ultrasound. (*Id.* at 333, 344, 379, 393.) Thus, Dr. Liacouras opines that, rather than a vaccine-related intussusception leading to L.C.'s cascading presentation, her intussusception was a later manifestation of her multi-system complications of her viral illness(es). (*Id.* at 346-47.) Dr. Liacouras doubts that the lymphoid hyperplasia noted upon autopsy would have been the lead point for the intussusception because it was not also noted on the surgical report. (*Id.* at 351-54.)

Ultimately, the fact that L.C. experienced an intussusception is undisputed, given that it was confirmed both by her second ultrasound and her surgery. However, although both experts engage in reasonable extrapolation from the medical records, very little else can be stated with full confidence.

The following factors favor petitioner's explanation:

- Apart from rotavirus, the evidence of record supports only one other virus (adenovirus) as being associated with intussusception (Tr. 70-71); however, L.C. tested negative for that virus.

[23] Dr. Andreae additionally noted during the hearing that the record of the ultrasound is limited to the ultimate conclusion that no intussusception was present and it contains no additional description of what was observed such that the clinical judgment underlying the conclusion could be assessed. (Tr. 182-83; Ex. 13, p. 90.)

- L.C.'s initial presentation was consistent with intussusception and intussusception remained in the differential diagnosis even after the first ultrasound. Moreover, the report of the first ultrasound was not detailed.

- Dr. Liacouras has not presented any literature specifically supporting his assertion that necrotic bowel can cause intussusception. Nor has he presented any literature explaining the timeframe over which an acute viral illness would lead to bowel necrosis or even specified when the bowel necrosis would have begun in this case.

- Dr. Andreae's opinion better aligns with L.C.'s official cause of death. L.C.'s death certificate, completed by treating physician Dr. Siegel, attributes her fatal septic shock (the immediate cause of her death) to her intussusception (Ex. 3), whereas Dr. Liacouras opined that L.C.'s intussusception was a later consequence of a preceding and cascading sepsis or sepsis-like presentation (Tr. 330-31).

- Dr. Andreae asserts that her explanation of events has the benefit of fitting Occam's razor. (Tr. 29-30.)

- L.C.'s autopsy (though not her surgical report) indicates that she had evidence of lymphoid hyperplasia (Ex. 15, p. 1), which is consistent with the theory presented by petitioner with respect to how the rotavirus vaccine can cause intussusception.

By contrast, the following factors favor respondent's explanation:

- Even having concluded the third dose of RotaTeq can cause intussusception under *Althen* prong one, it is still seemingly less likely that a third dose of the rotavirus vaccine would be a cause of a first intussusception as compared to an earlier dose. Post-vaccination viral shedding primarily occurs following a first dose,[24] and the available epidemiology, though it should be approached with caution, does suggest that, at least as far as we know, the incidences of intussusception are not elevated above background rates for the third dose.[25]

---

[24] This point also has significance with respect to Dr. Andreae's explanation for the gastrointestinal illness among L.C.'s family.

[25] *Andreu*, 569 F.3d at 1379 (explaining that, although petitioner's are not obligated to present epidemiology, "where such evidence is submitted, the special master can consider it in reaching an informed judgment as to whether a particular vaccination likely caused a particular injury"); *see also Hennessey v. Sec'y of Health & Human Servs.*, 91 Fed. Cl. 126, 140 (2010) (finding that "regardless of the relative strengths and weaknesses of epidemiology in general and as applied specifically to this case . . . . [t]he special master did not rely solely on the epidemiological evidence, but properly considered it along with the other evidence"). *But see Capizzano*, 440 F.3d at 1326 (noting a statistical likelihood of coincidence, but explaining that "the statute requires only that the claimant show that it is more likely than not that *this claimant's* RA was caused by the vaccine"); *Knudsen*, 35 F.3d at 550 (holding that "[t]he bare statistical fact that there are more reported cases of viral encephalopathies than there are reported cases

- Although no test is perfect, ultrasound is a very sensitive diagnostic tool for intussusception. Unlike Dr. Andreae's opinion, Dr. Liacouras's explanation does not need to explain away a potentially significant diagnostic finding in L.C.'s treatment history (*i.e.*, the absence of a detected intussusception on the first ultrasound).

- To the extent that interpretation of L.C.'s clinical history depends on the judgment of the parties' experts, Dr. Liacouras is better qualified to opine as to the expected course and findings relative not only to intussusception, but also the other gastrointestinal conditions potentially suggested by the diagnostic data.

"The Vaccine Act does not contemplate full blown tort litigation in the Court of Federal Claims. The Vaccine Act established a federal 'compensation program' under which awards are to be 'made to vaccine-injured persons quickly, easily, and with certainty and generosity.'" *Knudsen*, 35 F.3d at 549 (quoting H.R. Rep. No. 99-908 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6344). Accordingly, the Federal Circuit has suggested that this Program represents a "system created by Congress, in which close calls regarding causation are resolved in favor of injured claimants." *Althen*, 418 F.3d at 1280. Here, I have weighed all of the points above and have considered the record as a whole and conclude that this remains a close case. However, given that petitioner has satisfied *Althen* prongs one and three; given that her expert has presented a logical sequence of cause and effect that is reasonable, though not definitive; and given that L.C.'s official cause of death was septic shock due to intussusception, which is consistent with petitioner's contentions, I conclude that the evidence preponderates in favor of a finding that L.C.'s third dose of rotavirus vaccine did cause her intussusception and death. Although Dr. Liacouras's own interpretation of events is also reasonable and he is well qualified to render the opinion he has presented, he has not persuaded me under the circumstances presented that the fact of his competing opinion renders Dr. Andreae's interpretation of the records unreasonable or the sequence of events she proposed unlikely or illogical. *See Capizzano*, 440 F.3d at 1327 (explaining that a petitioner may prevail under *Althen* prongs one and three, but not *Althen* prong two, where it is nonetheless "illogical" to conclude that the vaccine was the cause of the injury).

Accordingly, petitioner has met her preponderant burden of proof under *Althen* prong two.

**d. Factor unrelated**

Once petitioner has met her own prima facie burden of proof, respondent may still demonstrate by a preponderance of evidence that the injury was nonetheless caused by a factor unrelated to the vaccination. § 300aa-13(a)(1)(B); *Deribeaux v.*

---

of DTP encephalopathies is not evidence that in a particular case an encephalopathy following a DTP vaccination was in fact caused by a viral infection present in the child and not caused by the DTP vaccine").

*Sec'y of Health & Human Servs.*, 717 F.3d 1363, 1367 (Fed. Cir. 2013). In order to meet his burden, respondent must demonstrate by preponderant evidence "that a particular agent or condition (or multiple agents/conditions) unrelated to the vaccine was in fact the sole cause (thus excluding the vaccine as a substantial factor)." *de Bazan*, 539 F.3d at 1354 (emphasis omitted).

In this case, respondent did present an expert opinion by Dr. Liacouras that attributed L.C.'s intussusception to an illness or illnesses unrelated to her vaccination. However, in his prehearing brief respondent argued only that Dr. Liacouras's opinion should prevent petitioner from meeting her own burden of proof under *Althen* prong two. He did not separately argue that he could meet his own preponderant burden of proof regarding the points underlying Dr. Liacouras's opinion. (ECF No. 79.) Nonetheless, I have considered in the interest of completeness whether Dr. Liacouras's opinion could preponderantly support respondent's burden of proof. I find that it does not. As discussed above, Dr. Liacouras's presentation, though reasonable overall, had shortcomings in not providing direct support for his linkage of necrotic bowel to intussusception and in not substantiating the timeframe within which a viral illness could be expected to lead to necrotic bowel, factors which become more significant when respondent bears the burden of proof. Moreover, L.C.'s official cause of death from her treating physician better aligns with the sequence of events proposed by petitioner, rather than Dr. Liacouras.

Accordingly, respondent has not met his preponderant burden of proof relative to a factor unrelated defense.

## VI. Conclusion

After weighing the evidence of record within the context of the Vaccine Program, and for all of the reasons discussed above, I find that petitioner has met her burden of proving by preponderant evidence that the third dose of the RotaTeq vaccine caused L.C.'s intussusception, leading to her ultimate death. Petitioner is therefore entitled to compensation. A separate damages order will be issued.

**IT IS SO ORDERED.**

**s/Daniel T. Horner**
Daniel T. Horner
Special Master